821 A.2d 372

**Rashida C. DASHIELL**

v.

**STATE of Maryland.**

**No. 32, Sept. Term 2002.**

Court of Appeals of Maryland.

April 10, 2003.

Stacy W. McCormack, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Rachel Marblestone Kamins. Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, J.

Rashida C. Dashiell, petitioner, seeks review of a judgment of the Maryland Court of Special Appeals affirming a trial judge's dismissal of petitioner's motion to suppress evidence as the fruit of an alleged illegal frisk. The suppression hearing was held on May 29, 2001, before the Honorable D. William Simpson of the Circuit Court for Wicomico County. Judge Simpson denied the motion to suppress, finding that the officers had the right to pat-down petitioner because they had the right to secure the premises during a search pursuant to a warrant. Judge Simpson stated:

"The Court believes that when the officers pursuant to a search warrant enter the premises, they do have the right to secure the people while they search the premises, and where they are entering pursuant to a search and seizure warrant on probable cause that drugs are being—that there is drug trafficking occurring within the premises to permit them to secure these individuals while the search pursuant to a warrant was being conducted without giving them the covenant right to pat down for weapons would be pure folly.

If you can secure them, I certainly think you can determine that they do have no weapons to injure those persons in the premises, so I am going to rule that the officers did have the right to pat down. Once they patted down, another officer determined that or talked to [petitioner] and

she said it was the dope in her pocket and they could see the plastic bag sticking out of her pocket, I believe at that point they had probable cause to seize that property, and I am going to deny your motion to suppress." [Alteration added.]

Petitioner waived her right to a jury trial. On July 25, 2001, petitioner was tried and convicted in the Circuit Court for Wicomico County on several counts, including two counts of possession of cocaine with intent to distribute, possession of cocaine and possession of marijuana. Judge Simpson sentenced petitioner to five years of incarceration, with all but eighteen months suspended.

Petitioner filed an appeal to the Court of Special Appeals. On March 5, 2002, the Court of Special Appeals affirmed the trial court's rulings. *Dashiell v. State*, 143 Md.App. 134, 792 A.2d 1185 (2002). The Court of Special Appeals held that a Wicomico County Task Force's policy mandating an automatic pat-down of every person located within a premises named in a search warrant was not justified. The intermediate appellate court, however, further held that the totality of the facts in this case justified the pat-down, when it said: "[l]ooking objectively at the facts known to the police in the case before us, we hold that a reasonably prudent officer would be warranted in believing that his or her safety or that of others was in danger when executing a 'no-knock' search warrant at Booth Street." [1] *Id.* at 149, 792 A.2d at 1193 (alteration added).

Petitioner then filed a timely Petition for Writ of Certiorari to this Court. Along with an answer to that petition, respon-

---

1. While the Court of Special Appeals identified the type of warrant in this case, the type of warrant has no bearing on the resolution of the basic issue. It is the content of the affidavit requesting the warrant upon which we rely. Our decision in this case should not be construed as an approval of "no-knock" warrants. We have not in our cases ever resolved whether the issuance of "no-knock" warrants is authorized under Maryland law. We do not resolve that issue in the present case because it is not the type of warrant that is determinative but the information upon which officers act which determines whether a frisk is permitted.

dent, the State of Maryland, filed a Conditional Cross–Petition, to which petitioner replied. On June 20, 2002, this Court granted both petitions. *Dashiell v. State,* 369 Md. 570, 801 A.2d 1031 (2002). In her brief, petitioner presents one question for our review:

"Does a police officer have the authority to detain and 'pat-down' every individual present in a home during the execution of a 'no-knock' search warrant?"

Petitioner argues that the police violated her Fourth Amendment rights when they frisked her for weapons absent particularized reasonable articulable suspicion that *she* was, in fact, armed and/or dangerous.

Respondent presents this Court with two questions:

"1. Did the police have the authority to detain and frisk every individual present at the scene where a narcotics search warrant was being executed?

"2. Would the evidence in this case inevitably have been discovered pursuant to the search warrant, the validity of which was never challenged?"

We hold that the mere issuance of a 'no-knock' warrant does not, *per se,* rise to the level of articulable suspicion needed for an officer to conduct a *Terry* frisk for weapons. But, we also hold that when specific information enumerating factors suggesting a possibility of weapons being present on the person or persons who might be in the premises and/or in the place to be searched is included within the affidavit to obtain a search warrant and the warrant issues without any limitations as to the officers' authority to frisk subjects for weapons, the police may frisk individuals found therein for weapons in order to ensure the safety of the officers. Where particularized and reliable information sufficient to cause a judge to issue a search warrant also states a reasonable ·belief that weapons may be located within the premises to be searched or on the person or persons anticipated to be present therein, the officers executing such a search have sufficient reasonable articulable suspicion to frisk persons inside that premises. As this was the case here, petitioner's motion to suppress was

properly denied. As we do not find the frisk to be in violation of petitioner's Fourth Amendment rights, we need not directly resolve the question of inevitable discovery contained within respondent's Conditional Cross–Petition.

## I. Facts

Petitioner's charges stem from a January 25, 2001 search of a private residence conducted pursuant to a search warrant. The Wicomico County Task Force (hereinafter, Task Force) conducted a four-month undercover investigation of Brewington Holton Bivens. On January 11, 2001, the Task Force applied for a search and seizure warrant to search Bivens and the residences located at "907, Apartment # 1, Booth Street" (hereinafter, Booth Street) and "1113, Apartment # A, Parsons Road" (hereinafter, Parsons Road), both residences in which the police alleged Bivens was concealing controlled dangerous substances (CDS).

The application for the search warrant included information obtained from several confidential informants and concerned citizens, as well as officers' observations during police surveillance of the residences and Bivens himself. The pertinent facts included that the Booth Street apartment was within the general area of an open air drug market and was being used as a stash house in Bivens' drug trafficking operations. This conclusion was supported by witness accounts, including police officer observations of heavy vehicle and pedestrian traffic with individuals only staying brief periods of time, which the Task Force attested were significant indicators of drug trafficking. In addition, confidential informants divulged that large quantities of controlled dangerous substances were seen at the Booth Street apartment and on Bivens' person. Facts asserted in the application indicated that Bivens personally engaged in drug transactions with many of the frequent visitors to Booth Street. The Task Force also knew that Bivens had been previously charged with drug-related and violent offenses and had been involved in a high-speed police chase after a routine traffic stop. A "concerned source of information," named "D" in the affidavit, reported, pursuant to

"D's" own personal knowledge, Bivens' drug-related activities and that "D" had "seen several guns inside [Booth Street] and had observed Brewington Bivens with a handgun." (alteration added). Judge Donald C. Davis then issued the warrant finding probable cause that criminal activity was being conducted at the Booth Street house.

The police executed the Booth Street search warrant on January 25, 2001. Bivens was not present during the execution of the warrant; rather petitioner, petitioner's two children and Angela Bower were the only people located in the Booth Street residence at that time. The police entered the Booth Street residence at approximately 9:00 p.m. by ramming open the front door. After the entry team entered the apartment, Corporal Michael Kravecz, a member of the Task Force, testified that "everyone in the residence was handcuffed and secured and put on the ground while the team searched the residence for other subjects in the house. Once everyone was secured, they went back and then patted down all the individuals in the house for weapons."

After the adults in the residence were frisked, the member of the entry team who conducted the frisk of petitioner informed Corporal Kravecz that petitioner had a plastic bag, which the officer suspected to be crack cocaine, in her front pants pocket. The officer had not removed the plastic bag from petitioner's pocket. Corporal Kravecz testified that he approached petitioner and stated, "one of the State team's members stated that you had something on you," to which she replied, "yes, the dope." At this time, Corporal Kravecz observed a plastic bag hanging out of her right front pants pocket. He then removed the plastic bag and petitioner was placed under arrest.[2] During the subsequent search of petitioner incident to her arrest, additional controlled dangerous

---

2. Petitioner does not object to the seizure of these drugs by Corporal Kravecz after petitioner admitted to having the "dope." She challenges the constitutionality of the initial frisk, which led to the information Corporal Kravecz used to confront petitioner and elicit her incriminating statement, thus arguably giving Corporal Kravecz probable cause to seize the plastic bag sticking out of her pocket.

substances, including crack cocaine and marijuana, were found on her person. At that time, a simultaneous search of the residence was being conducted, in which the police recovered marijuana underneath a sofa cushion in the living room. Later, during her booking procedure, petitioner gave the Booth Street residence as her home address.

## II. Discussion

### A. Standard of Review

The standard of review of motions to suppress has recently been summarized by this Court in the case of *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660, 663–64 (2002), when we said:

"Our review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *See Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491, 497 (1999); *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691, 693 (1997); *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, 22 (1990); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749, 755 (1987). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favorable to the State as the prevailing party on the motion. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Simpler*, 318 Md. at 312, 568 A.2d at 22. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Lancaster v. State*, 86 Md. App. 74, 95, 585 A.2d 274, 284 (1991); *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356, 358 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *McMillian v. State*, 325 Md. 272, 281–82, 600 A.2d 430, 435 (1992); *Riddick*, 319 Md. at 183, 571 A.2d at 1240. Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own inde-

pendent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick,* 319 Md. at 183, 571 A.2d at 1240; *Munafo v. State,* 105 Md.App. 662, 669, 660 A.2d 1068, 1071 (1995)."

In the case *sub judice,* as petitioner does not question whether the factual findings of the hearing judge were clearly erroneous, we need only look to the purely legal issue of whether the officer's pat-down frisk of petitioner was in violation of petitioner's Fourth Amendment rights. We hold that such a frisk, under the facts of this case, did not violate petitioner's Fourth Amendment rights. We hold that sufficient reasonable suspicion exists for an officer to conduct a *Terry* frisk of occupants located within a premises subject to a search warrant when reliable articulable facts indicating that weapons might be located therein, or on the persons contemplated to be present in the premises, are specifically enumerated by the affiant in the search warrant application and that warrant is issued without the imposition of any limitations as to the officers' authority to frisk for weapons.

## B. The Frisk

The Fourth Amendment of the United States Constitution, in its guarantee to protect individuals from unreasonable government searches and seizures, states:

"The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

These guaranteed Fourth Amendment protections are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, 61, *cert. denied,* 502 U.S. 973, 112 S.Ct. 452, 116 L.Ed.2d 470 (1991).

■ The case *sub judice* involves a rather narrow issue within the breadth of Fourth Amendment jurisprudence. The essential question is whether the Fourth Amendment prohibits an officer from conducting a limited protective frisk[3] for weapons on persons located within a residence being searched pursuant to a valid search warrant where those persons were not named in the warrant, the house was being used in a drug trafficking operation and, based upon reliable information, weapons were believed to be located in the house and/or on the persons named in the warrant. The doctrine of protective frisks and pat-downs of individuals without a warrant is governed by the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.

In *Terry*, the Supreme Court, in creating an exception to the Fourth Amendment requirement of probable cause whereby officers are able to take certain steps to ensure their safety while investigating crime by frisking individuals for weapons, said:

---

**3.** The terms "frisk" and "pat-down" refer to the type of limited inspection discussed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), where an officer merely checks an individual for weapons, while not conducting a full search of that individual's person. The *Terry* Court said that an officer frisking an individual in an effort to discover guns, knives or other weapons, "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of [those] persons." *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911 (alteration added).

Petitioner, in her brief and argument to this Court often used the term "search" in lieu of "frisk" or "pat-down." The record here, however, is clear, viewing the record most favorable to respondent as the prevailing party on the motion to suppress, that the entry team member merely conducted a protective frisk of petitioner and not a full-blown search of her person, as might be suggested by petitioner's use of the word "search." At the motions hearing, Corporal Kravecz testified that an entry team member, who had patted petitioner down on the outside of her clothing, reported to Corporal Kravecz that he had "located a plastic bag of suspected crack cocaine in [petitioner's] front pants pocket" and that "[t]hey didn't remove it [from petitioner's pocket]." (alterations added). It was only after petitioner admitted to having drugs on her person that she was "searched."

"Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

"In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

*Terry,* 392 U.S. at 23–24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907–08 (footnote omitted). In footnote 21 of the *Terry* opinion, accompanying the above quoted text, the Supreme Court stated:

"The easy availability of firearms to potential criminals in this country is well known and has provoked much debate. Whatever the merits of gun-control proposals, this fact is relevant to an assessment of the need for some form of self-protective search power ."

*Id.* at 23–24 n. 21, 88 S.Ct. at 1881 n. 21, 20 L.Ed.2d at 907–08 n. 21 (citation omitted).

 In discussing the standard to which an officer's ability to assess whether a protective frisk of an individual for weapons is warranted, the Supreme Court further stated:

"Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer,

where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; *the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.* And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Id.* at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (citations omitted)(emphasis added). The objective reasonable suspicion standard is considerably less than the preponderance or probable cause standards. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). While absolute certainty is not required, a mere hunch or unparticularized suspicion will not suffice. *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. This Court has said that reasonable suspicion "is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Cartnail v. State,* 359 Md. 272, 286, 753 A.2d 519, 527 (2000). Determinations of whether a particularized reasonable suspicion exists should be analyzed under the totality of the circumstances. *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585, 104 L.Ed.2d at 10; *Derricott v. State,* 327 Md. 582, 588, 611 A.2d 592, 595–96 (1992).

Shortly after it issued the *Terry* mandate, the Supreme Court, using *Terry*'s objective standard, validated an officer's use of such a protective frisk for weapons where the officer's reasonable suspicion to conduct a *Terry* frisk was not based on the officer's personal observation, but on that of an informant. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The Supreme Court, in *Adams,* said:

"Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.... But in some situations—for example,

when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

"While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a high-crime area at 2:15 in the morning, Sgt. Connolly had ample reason to fear for his safety."

*Id.* at 147–48, 92 S.Ct. at 1924, 32 L.Ed.2d at 617–18.

■ In this case, Corporal Kravecz's affidavit in support of the application for the search warrant of the house at Booth Street and the one at Parsons Road and of Bivens' person, relied on numerous accounts of concerned citizens, informants and police officer observations. Corporal Kravecz was armed with information that a drug operation was being conducted at Booth Street from informants who were known to provide reliable information. These accounts were corroborated by officer observations of specific indicia illustrating a substantial likelihood of drug trafficking activity at Booth Street, as evidenced by heavy foot and vehicle traffic staying at the residence for short periods of time, complaints from neighborhood citizens regarding drug trafficking at that residence and witnesses' personal observations of controlled dangerous substances and weapons on the person of Bivens and in the Booth Street residence. The Task Force and entry team, from their experience, their knowledge of the relationship between guns and drugs, their knowledge of Bivens' violent past and *witnesses' observations of weapons located inside the house,* had considerable evidence from reliable sources that a drug trafficking operation was being conducted at Booth Street and, under the totality of these circumstances, had significant reasons to fear for their safety and the safety of others during the execution of the Booth Street search warrant.

■ Petitioner argues, regardless of the valid search warrant issued to search Booth Street and the Task Force's

knowledge of drug trafficking being conducted out of the premises, that, even while weapons were alleged to be within the premises and on Bivens' person, the entry team member who frisked her had no particularized suspicion that she, herself, was armed and dangerous. In support of this proposition, petitioner relies on the Supreme Court case of *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). Under the facts here present, however, *Ybarra* is not applicable because the totality of the circumstances here present would lead a reasonable officer to fear for his safety.

The Supreme Court, in *Ybarra*, was mindful of individuals' Fourth Amendment guarantees when that Court held that the mere presence of an individual at the place being searched pursuant to a valid search warrant does not automatically justify a search. *Id.* at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245. In *Ybarra*, the police obtained a search warrant to search the Aurora Tap Tavern and its employee bartender, Greg, for controlled dangerous substances after an informant gave the police specific information that the bartender was engaged in the sale of narcotics. The police executed the search warrant during the afternoon and announced their purpose to the patrons of the tavern. The officers then conducted a *Terry* frisk for weapons on the 9 to 13 patrons. The officer frisking Ybarra felt a cigarette pack with object inside it, but did not remove it. The officer later returned and frisked Ybarra again, reached inside Ybarra's pants pocket and took the cigarette pack.

Petitioner argues that *Ybarra* is "a case strikingly similar to the instant case" and later supports her argument by quoting from *Ybarra*, including the following language:

"But a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to *probable cause* to search that person. *Where the standard is probable cause*, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another

or to search or seize the premises where the person may happen to be."

*Ybarra*, 444 U.S. at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245 (citation omitted)(emphasis added). This language, however, is in reference to whether the search of Ybarra was justified under a probable cause standard, not one of reasonable suspicion. In this case, the State does not contend that the entry team initially had probable cause to search petitioner; the only initial justification for a frisk was that the officers reasonably feared for their safety. The *Ybarra* Court, however, went on to define the limits of the *Terry* frisk exception when, in the absence of probable cause to search Ybarra, the Court rejected the argument that Ybarra's frisk was supported by reasonable suspicion. The Court stated:

"The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612; *Terry v. Ohio, supra*, 392 U.S., at 21–24, 27, 88 S.Ct., at 1879–1881, 1883. When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history *nor had any particular reason to believe that he might be inclined to assault them.* Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. . . . In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

"The *Terry* case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.' Under that doctrine a law enforcement officer, for his own protection and safety,

may conduct a patdown to find weapons *that he reasonably believes or suspects are then in the possession of the person he has accosted.* Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."

*Id.* at 93–94, 100 S.Ct. at 343, 62 L.Ed.2d at 246–47 (citation omitted)(footnotes omitted)(emphasis added).

The facts purporting to justify a weapons frisk based on peril to the officers in *Ybarra*, pale in comparison to those in the instant case. While the Supreme Court stated that the police did not have "any particular reason to believe that [Ybarra] might be inclined to assault them," because Ybarra was a random patron in a public business not acting in a suspicious manner, the officer who frisked petitioner in the case *sub judice* did have a reasonable belief that petitioner could have been armed and dangerous based on several particularized facts contained in the application for the search warrant. First, the Task Force had voluminous evidence of drug trafficking activities at Booth Street reasonably suggesting that the numerous visitors to Booth Street, and thus its occupants at the time of the warrant's execution, were involved in the drug trade. Weapons and guns are widely known to be used in narcotics trafficking [4] and, in this case,

---

**4.** Corporal Kravecz and his co-affiant, Corporal Cook, attested that their training and experience gave them the knowledge that persons involved with the distribution of illegal drugs in Wicomico County "carry all types of weapons which puts the officers in danger during the execution of search and seizure warrants."

While this may be a factor in a totality determination of whether the officers possessed the requisite reasonable suspicion to fear for their safety, this, merely coupled with evidence of drug trafficking, normally will not be the determinative factor. Generally, this factor by itself would amount to nothing more than a "hunch" as described in *Terry*. In the case *sub judice*, however, the Task Force had particularized

the police had particularized knowledge that "several guns" were located within the Booth Street premises.

Another important difference is that Ybarra, a patron in a bar, was searched in a public business, while petitioner was frisked inside a private residence in which she lived.[5] We also believe this distinction to be of additional significance. The relationship between a patron of a bar and the bar's employee's illegal drug trafficking is, generally, more tenuous than an individual's relationship to the activities being conducted inside the private home in which they live. The police in *Ybarra* had no indication that Ybarra or any other patron was involved with the bartender's heroin operation. As the Aurora Tap Tavern was open for business at the time of the warrant's execution, the likelihood that individuals with no knowledge or participation in the bartender's heroin trade were present was extremely high. In contrast, the execution of the Booth Street warrant occurred at 9:00 p.m. at a private residence. Presumably, all occupants of the home at that time were invited guests or residents, not random visitors whose identities were unknown to the residents. As such, the likelihood that those occupants knew of the drug trafficking operation occurring out of that household, especially in light of the police surveillance and numerous witnesses observing the heavy traffic in and out of that residence, was high.

Officers normally have an additional reason to be wary of possible dangers when executing a search warrant in a private

___

suspicion that persons inside the Booth Street stash house might present a danger to them, because they had information indicating, specifically, that Bivens carried a firearm and that several weapons had been seen inside the Booth Street residence.

5. Petitioner, after she was arrested and during the booking process, later informed the police that she was a resident of the Booth Street home, thus confirming her substantial connection to the premises. This fact, however, was not known to the entry team when they frisked petitioner and is thus not a part of our determination. Regardless of whether petitioner was a resident of Booth Street, her presence on the premises to be searched pursuant to a valid warrant where guns and weapons were alleged to be located is sufficient, under the circumstances here present, to justify a *Terry* frisk of her.

residence because an individual within a private residence is usually more familiar and comfortable in those surroundings, which puts the officers at a serious disadvantage. *See Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). In the context of an in-home arrest, the *Buie* Court stated:

> "The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.... Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."

*Id.* at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285. In fact, an officer may not normally know where weapons may be hidden in a private home, while the occupant may easily ambush the officer by concealing potential dangerous weapons within arm's reach. Also, the occupants or residents are likely to react adversely to the police entrance into their home. Police surveillance and witness accounts of the heavy traffic at Booth Street at all hours of the day and night gave the police reason to believe that, upon entry, the officers could expect to encounter several persons inside the residence, all whom might have had access to the weapons reported to be therein. Given these distinctions, petitioner's contention that *Ybarra* is "a case strikingly similar to the instant case" is unfounded.[6]

The Supreme Court in *Michigan v. Summers,* while not specifically authorizing *Terry* frisks for weapons in all search

---

6. A policy of conducting frisks in narrow circumstances, such as in the case at bar, may help ensure the safety of the occupants as well as the officers. An officer who believes there may be weapons inside a house that is going to be entered under a warrant will be, and rightfully so, on high alert. Any sudden movement by any occupant might elicit a quick reaction from the officer, including, perhaps, the drawing of the officer's firearm. Such a situation is potentially dangerous to the residents and the officer. That danger may, we believe, in part, be lessened after the officer is able to check each occupant for weapons the officer has reason to believe might be somewhere on the premises.

warrant cases, recognized the potential dangers associated with searches of private residences suspected of being involved with drug trafficking when it created a broad right for police officers to secure premises during a search warrant. The Court stated, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340, 351 (1981) (footnote omitted). In its assessment of both the law enforcement interests in detaining the occupants of the premises being searched and the specific articulable facts supporting such a detention, the *Summers* Court recognized the extraordinary dangers to police during their execution of search warrants.[7] The Court said:

> "Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, *but sometimes of greater importance*, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."

---

**7.** *Summers* did not involve "frisks." In that case, the officers executing a search warrant for a residence observed Summers exiting the front door of said home. Once entry into the premises was obtained, an officer brought Summers inside the home. The search uncovered narcotics located in the basement of the house. After the officers determined that Summers was the owner of the house, they arrested him. In conducting a search incident to that arrest, the officers found heroin on the Summers' person. Summers challenged the officer's ability to detain him while executing the search. The *Summers* Court did not reach the question of whether a search warrant for a premises necessarily includes the right to search all persons found therein. Some of the Court's reasoning, however, is applicable to the officer's authority to "frisk" petitioner in case at bar pursuant to the execution of the valid search warrant suggesting the possibility that weapons were located within the premises to be searched.

*Id.* at 702–03, 101 S.Ct. at 2594, 69 L.Ed.2d at 349–50 (footnote omitted)(emphasis added).

In addition, the *Summers* Court recognized that an "incremental intrusion on personal liberty" may be justified when an independent judicial officer has approved entry into the home by issuing a valid search warrant. The Court said:

> "It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home *subject to a search warrant.* We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. *The existence of a search warrant, however, also provides an objective justification* for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. *Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of the home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.*"

*Id.* at 703–04, 101 S.Ct. at 2594–95, 69 L.Ed.2d at 350 (footnote omitted)(emphasis added).

In the case *sub judice,* a neutral judicial officer made a determination that there was probable cause to believe that criminal activity, namely drug trafficking, was taking place within and from the Booth Street home. Under *Summers,* petitioner's residence in the Booth Street home, regardless of the fact that she was not mentioned in the search warrant, gave the entry team members "an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of" petitioner.[8] *Id.* This Court recognizes,

---

8. Petitioner does not challenge her detention, just the frisk following that detention.

and respondent concedes, that this rationale does not necessarily justify a *Terry* frisk of all occupants of a place being searched pursuant to every valid warrant. *Terry* still requires particularized suspicion articulating the potential danger posed by individuals anticipated to be on the premises to be searched by the police. In the case *sub judice,* the most relevant of *Summers'* three justifications for detaining occupants during the execution of a search warrant [9] is "minimizing the risk of harm to the officers" executing the warrant. *Id.* at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349. The criminal activity for which Judge Davis determined there was probable cause to issue a warrant in this case included reliable information that weapons were located on the person of an individual anticipated to be present, as well as in the residence being used in a drug trafficking enterprise. The totality of the facts suggest that any occupant of the Booth Street residence might present an imminent danger to the entering officers by using one of the "several guns" alleged to be on the premises. The police frisk of such occupants, under circumstances as in the case *sub judice,* allowed the officers to take "unquestioned command of the situation," as mandated in *Summers.*

■ Judge Davis issued what he described as a "no-knock" warrant to enter Booth Street.[10] A judicial officer normally authorizes a "no-knock" warrant when exigent circumstances justify such an entry. *See Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997); *State v. Riley,*

---

**9.** The Court justified the detentions under three circumstances: 1) having the occupant accessible to aid in the search; 2) preventing the occupant from fleeing if contraband is located; and 3) "minimizing the risk of harm to the officers." *Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2593–94, 69 L.Ed.2d at 349–50. *See also Stanford v. State,* 353 Md. 527, 534, 727 A.2d 938, 942 (1999).

**10.** Again, we do not in this case put our stamp of approval on "no-knock" warrants. The issue in this case does not involve whether "no-knock" warrants are authorized, but whether the police have the right to frisk pursuant to facts alleged in an affidavit supporting an application for a warrant. In the context of the issue in this case the type of warrant sought or issued is immaterial. There is no direct attack on "no-knock" warrants presented in this case.

147 Md.App. 113, 807 A.2d 797 (2002); *Davis v. State,* 144 Md.App. 144, 797 A.2d 84 (2002). Exigent circumstances may exist when the police have a reasonable suspicion that knocking and announcing " 'would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.' " *Riley,* 147 Md.App. at 123, 807 A.2d at 803 (quoting *Richards,* 520 U.S. 385, 394, 117 S.Ct. at 1421, 137 L.Ed.2d at 624).

In this case, the "no-knock" search warrant was issued not only to prevent the destruction of evidence, but for officer safety.[11] In issuing the "no-knock" search warrant based on these justifications, Judge Davis, when he issued the search warrant, in essence, made an independent judicial determination that there existed a reasonable suspicion that entry into the Booth Street premises would be both "dangerous" and perhaps "futile." Because the affidavit on which Judge Davis relied included information that "several guns" were located on the premises and also on Bivens' person, the officers had reason to believe that individuals therein might pose a serious threat to the entering officers.

Petitioner argues, and the Court of Special Appeals held, that the Task Force's policy of automatically frisking every occupant during the execution of any search warrant is invalid. Given our holding in this case, we need not address that issue. There was, in this case, a sufficient factual basis justifying the frisk of petitioner.

---

**11.** Petitioner argues that the intermediate appellate court's ruling stands for the proposition that in every case where a "no-knock" warrant is issued a *Terry* frisk of all occupants inside the residence to be searched is justified. This argument ignores the clear language of that opinion, in which that court partook an in-depth analysis of the totality of the circumstances surrounding the frisk of petitioner. The issuance of a "no-knock" warrant was merely one factor in the Court of Special Appeals' analysis. At oral argument, respondent conceded the fact that there may be, albeit in rare instances, circumstances that could possibly call for the issuance of a "no-knock" warrant on merely the destruction of evidence justification. Our decision today, however, applies to situations where there is *specific* information that weapons are located within the premises to be searched, regardless of whether a so called "no-knock" warrant or other warrant has been issued.

Petitioner additionally argues that the holding we render today might lead to an inclusion of fictional facts suggesting the existence of weapons inside a residence to be searched with every search warrant application, whether it was justified or not. Even if law enforcement entities were to resort to such unethical and abhorrent behavior, it would presumably be unsuccessful as such a search warrant application would still be subject to extensive scrutiny and approval by a neutral magistrate.

Our decision today is in accord with several other courts throughout the country that have upheld *Terry* frisks for weapons in circumstances similar to those in the case *sub judice,* and, in many of the cases, where the circumstances provided a less particularized set of facts. *See People v. Thurman,* 209 Cal.App.3d 817, 823, 257 Cal.Rptr. 517, 520 (1989) (upholding a protective *Terry* frisk for weapons during the execution of a search warrant for drugs when an officer frisked an individual who was not named in the warrant but was sitting quietly on a couch in a non-threatening manner, because, in part, the officers "were engaged in an undertaking fraught with the potential for sudden violence"); *State v. Trine,* 236 Conn. 216, 673 A.2d 1098 (1996)(upholding a *Terry* frisk of an individual inside a private residence where the officer was aware that the affidavits used to obtain a valid search warrant for narcotics indicated a high probability of weapons being found on the scene, even though the defendant complied with the officer's directions, was handcuffed and then frisked for weapons); *Condon v. State,* 203 Ga.App. 163, 416 S.E.2d 802 (1992)(validating a *Terry* frisk where an individual was frisked after he drove his truck onto the premises being searched pursuant to a valid narcotics warrant regardless of the fact that the man was not named in warrant and was not a resident of the premises); *State v. Kester,* 137 Idaho 643, 51 P.3d 457 (2002)(holding that the officers had a reasonable suspicion to believe the defendant posed a danger sufficient to justify a protective frisk when the officers executed a "no-knock" search warrant for narcotics and weapons at 11 p.m. and frisked the defendant as he approached the house being

searched); *State v. Bitterman*, 304 Minn. 481, 485, 232 N.W.2d 91, 94 (1975)(police were allowed to conduct a *Terry* frisk on individuals in the "volatile situation" where persons approached a premises being searched pursuant to a narcotics search warrant); *State v. Dawson*, 295 Mont. 212, 983 P.2d 916 (1999)(holding a police frisk of an individual entering a hotel room as the room was being searched for drugs pursuant to a valid warrant was valid); *State v. Taylor*, 82 Ohio App.3d 434, 612 N.E.2d 728 (1992)(upholding an officer's right to frisk an occupant of a residence suspected of being a crack house during a search pursuant to a valid warrant, although there was no specific danger other than the relationship between weapons and drugs); *Commonwealth v. Patterson*, 405 Pa.Super. 17, 591 A.2d 1075 (1991)(allowing the frisk of an individual approaching a known crack house in the early morning due to the significant danger the man presented because of the close relationship between guns and drugs); *State v. Curtis*, 964 S.W.2d 604 (Tenn.Crim.App.1997)(allowing a frisk for weapons because of the fact that weapons are often carried by those engaged in illegal drug trafficking); *Murphy v. Commonwealth*, 37 Va.App. 556, 559 S.E.2d 890 (2002)(holding, pursuant to the reasoning in *Summers*, that an officer can perform a *Terry* search on an unsuspicious occupant of a private residence being searched pursuant to a valid search warrant whose application contained an affidavit seeking permission to search for weapons and drugs and did not mention that occupant. The Virginia Supreme Court, however, later reversed on grounds that the frisk exceeded the scope allowed in *Terry*.); *State v. Howard*, 7 Wash.App. 668, 502 P.2d 1043 (1972)(holding that an officer had the authority to detain and frisk an individual who drove a vehicle up to the rear door of a premises being searched pursuant to a valid warrant to search for drugs); *State v. Guy*, 172 Wis.2d 86, 492 N.W.2d 311 (1992)(finding that the frisking officer had reasonable suspicion to believe that the officer was in danger when an individual, although not acting threatening at the time, was an occupant of a home being searched pursuant to a valid narcotics warrant and, additionally because there was a potential for

sudden violence, a neutral magistrate had issued a warrant and there exists a close relationship between weapons and drugs). *See also, United States v. Proctor,* 148 F.3d 39 (1st Cir.1998)(upholding a police frisk of an individual approaching a private residence being searched pursuant to a valid narcotics warrant because it was reasonable to infer that the individual was a involved in the drug trade and was thus dangerous); *Rivera v. United States,* 928 F.2d 592 (2nd Cir.1991)(holding that where officers have the authority to detain an individual due to the fact that a search warrant is being conducted, officers necessarily can protect themselves with a limited search for weapons); *United States v. Reid,* 997 F.2d 1576 (D.C.Cir.1993)(holding it reasonable for officers to suspect an individual of being a threat when the individual is present in a private residence being searched for illegal drugs).

### III. Conclusion

In conclusion, we hold that officers executing a search warrant based upon an application which specifically articulates that the search is to be of an armed individual and of a residence where weapons may be found, can conduct a pat-down frisk of the individuals located inside that residence. When the warrant application specifically articulates that weapons are known to be on the premises to be searched for drugs and the judge issuing the warrant does not reject that part of the application, an inherent danger may exist to those officers executing such a search. The United States Supreme Court, in *Terry,* noted that police officers cannot be required to take unnecessary risks when they reasonably suspect an individual to be armed and dangerous. When particularized and reliable indicia within a search warrant application specify that weapons might be located on the premises to be searched or on persons therein, there is necessarily reasonable articulable suspicion that occupants of the premises may pose a danger or threat to officers as contemplated in *Terry.* The officers in this case did not violate petitioner's Fourth Amendment rights. Accordingly, we affirm the decision of the Court of Special Appeals.

## JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.

BELL, C.J. and ELDRIDGE, J., Dissent.

ELDRIDGE, J., dissenting.

The majority decides this case on a ground not litigated at the suppression hearing, not relied on by the Circuit Court in denying the motion to suppress, not the basis for the Court of Special Appeals' decision, and not presented in either the certiorari petition or the cross-petition. Moreover, the majority resolves in the petitioner's favor the only issue that was litigated and decided at the suppression hearing.

The majority opinion states (slip opinion at 3): "We hold that the mere issuance of a [search] warrant does not, *per se,* rise to the level of articulable suspicion needed for an officer to conduct a *Terry* frisk for weapons." The majority upholds the search on the ground that "specific information enumerating factors suggesting a possibility of weapons being present on the person or persons who might be in the premises and/or in the place to be searched [was] included within the affidavit to obtain the search warrant" (*ibid.*).

The entire transcript of the suppression hearing, as set forth in the record extract before this Court, contains utterly no mention of the affidavit or of the facts set forth in the affidavit. Although the affidavit is included in the record before us, the Circuit Court made no reference to it, or to the facts contained thereon, in denying the motion to suppress.

It is clear from the transcript of the suppression hearing that the issue was the "State team's" or "Task Force's" policy, in executing a search warrant in *every* case, to handcuff everyone on the premises and pat them down. The State's only witness at the suppression hearing, Corporal Kravitz, a member of the Task Force, testified that "the policy was to go in there and handcuff everyone.... That's the State Team's policy. * * * And then they ... pat down all the subjects...."

At the suppression hearing, defense counsel's argument to the court was a challenge to this policy. He contended: "Your Honor, just because the police officers pursuant to a search warrant enter a residence does not give them a right to detain and search individuals." The prosecuting attorney countered that " 'a warrant to search for contraband found on probable cause implicitly carries with it the limited authority to detain the occupants on the premises' " and "[a]dditionally, Your Honor, it carries with it the authority to pat those individuals down for weapons." The suppression judge then asked the prosecuting attorney, "[b]y what authority," and the arguments over the validity of the Task Force's policy continued.[1]

At the conclusion of the arguments, the Circuit Court denied the motion to suppress on the ground that the Task Force's policy was valid. The court distinguished between a full "search" and a "pat down for weapons." The court held that, although a detention and full "search" of everyone on the premises may not have been permissible, that "officers pursuant to a search warrant to enter the premises ... have the right to secure the people" and "that the officers did have the right to pat down." This ruling was in no way based on the "facts" set forth in the affidavit, which were not even mentioned, or the facts of this particular case. There is no indication from the transcript of the suppression hearing that the affidavit was attached to the warrant or was independently before the suppression judge. Instead, the Circuit Court decided that, in *any* search of premises pursuant to a search warrant, the officers can *always* handcuff and pat down everyone found in the premises.

This Court has consistently held that "[o]ur review of the trial court's" ruling on "a motion to suppress evidence under the Fourth Amendment is based solely on the record of the suppression hearing. * * * We defer to the fact finding of the suppression court and accept the facts as found by that

---

1. The only other argument made was by the prosecutor who alternatively contended that "what we have here is a situation of inevitable discovery." The Circuit Court did not decide this issue.

court unless clearly erroneous." *Williams v. State*, 372 Md. 386, 401, 813 A.2d 231, 240 (2002), and cases there cited. The majority's decision today is most certainly not based on the record of the suppression hearing or the facts as found by the suppression court.

Moreover, the majority's decision departs from the apparent basis of the Court of Special Appeals' affirmance and clearly departs from the question presented in the certiorari petition. The Court of Special Appeals initially agreed with the defendant's argument at the suppression hearing and disagreed with the basis for the suppression judge's ruling. The intermediate appellate court held (*Dashiell v. State*, 143 Md.App. 134, 148–149, 792 A.2d 1185, 1193 (2002), footnote omitted):

"Appellant contends, however, that the police cannot justify a policy of conducting an automatic pat-down of every person on the premises that is named in the search warrant when executing the warrant. We agree. *See Ybarra*, 444 U.S. at 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238. The constitutionality of a pat-down depends on the particular facts of each case."

Later, however, the Court of Special Appeals seemed to rely on the fact that a "no-knock" warrant was utilized as providing evidence of a "danger" justifying the Task Force's policy of handcuffing and patting-down everyone on the premises. *Dashiell v. State, supra*, 143 Md.App. at 152–153, 792 A.2d at 1195–1196. Thus, the intermediate appellate court seemed to hold that the Task Force's policy was valid whenever "no-knock" warrants were utilized.

In accordance with the disputed issue at the suppression hearing and the rulings of both courts below, the defendant's petition for a writ of certiorari presented a single question, namely whether the Task Force's policy was valid whenever a "no-knock" warrant was issued. The question presented was: "Does a police officer have the authority to detain and 'pat-down' every individual present in a home during the execution of a 'no-knock' search warrant...." The State's conditional cross-petition simply added the inevitable discovery issue

which had been raised in, but not ruled upon by, the suppression court.

Despite the record of the suppression hearing, the ruling of the suppression court, and Maryland Rule 8–131(b),[2] this Court decides the case on a ground not mentioned during the suppression hearing. Such an approach is unfair to the litigants and inconsistent with our decisions. While in the present case it is unfair to the defendant, the same approach in some other case could be used to find grounds for the grant of a suppression motion.

Chief Judge BELL has authorized me to state that he joins this dissenting opinion.

---

2. Rule 8–131(b) provides as follows:

"(b) **In Court of Appeals—Additional limitations.** (1) Prior appellate decision. Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals. Whenever an issue raised in a petition for certiorari or a cross-petition involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition or in a cross-petition."