*State of Maryland v. Hussain Ali Zadeh*, No. 25, September 2019 Term. Opinion by Hotten, J.

**CRIMINAL LAW—JOINDER OR SEVERANCE OF CO-DEFENDANTS—LIMITING INSTRUCTIONS AND OTHER REMEDIES**

The Court of Appeals held that the cumulative effect of the introduction of non-mutually admissible evidence unfairly prejudiced Respondent. The trial court abused its discretion in denying the motion for severance, because the limiting instructions were insufficient to cure the prejudice that resulted from the introduction and admission of the non-mutually admissible evidence. Under *Hines*, severance is appropriate where (1) non-mutually admissible evidence will be introduced; (2) the admission of the evidence causes unfair prejudice; and (3) such prejudice cannot be cured by other relief, such as limiting introductions or redactions. Petitioner relied on testimony from witnesses regarding statements the co-defendant, Ms. Pannell-Brown allegedly made, evidence of financial issues she was experiencing with her deceased husband, and other non-mutually admissible evidence. Over the course of the trial, at least nine limiting instructions were given regarding this evidence. The number of limiting instructions effectively rendered the instructions meaningless, because a reasonable juror would not have been able to decipher which evidence was admissible against which defendant. Once the trial court determined that there was far more non-mutually admissible evidence than originally thought, severance was no longer an available remedy. In that case, a mistrial was the next available remedy and the motion for a mistrial should have been granted. Accordingly, Respondent was prejudiced by the joinder of his trial with his co-defendant and the trial court abused its discretion in denying the respective motions for severance and a mistrial.

**CONSTITUTIONAL LAW—FOURTH AMENDMENT—SEARCHES AND SEIZURES—SUPPRESSION OF EVIDENCE—WARRANT EXCEPTIONS—PLAIN-FEEL DOCTRINE**

The Court of Appeals held that the seizure of a cell phone from Respondent was unlawful because (1) the vehicle warrant and the probable cause sufficient for the search of that vehicle did not authorize the seizure of the cell phone from his person, (2) the officer exceeded the parameters of the plain-feel doctrine, and (3) none of the other delineated exceptions to the warrant requirement applied. Accordingly, the cell phone and any evidence obtained from it should have been suppressed, as the seizure of the phone without a warrant or applicable exception to the warrant requirement violated the Fourth Amendment to the United States Constitution and Article 26 of the Maryland Declaration of Rights.

Circuit Court for Montgomery County
Case No. 127706C
Argued: November 5, 2019

_____

STATE OF MARYLAND

v.

HUSSAIN ALI ZADEH

_____

McDonald,
Watts,
Hotten,
Getty,
Booth,
Battaglia, Lynne A., (Senior Judge,
Specially Assigned),
Greene, Clayton, Jr. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Hotten, J.
Watts, J., joins in judgment only.
McDonald and Getty, JJ., dissent in part.

_____

Filed: April 3, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Respondent, Hussain Ali Zadeh, was tried in the Circuit Court for Montgomery County along with co-defendant, Larlane Pannell-Brown ("Ms. Pannell-Brown"), for the murder of Ms. Pannell-Brown's husband, Cecil Brown ("Mr. Brown"). Following a three-week jury trial, both defendants were convicted of second-degree murder and sentenced to 30 years in prison. The defendants noted timely appeals to the Court of Special Appeals, which consolidated their cases for argument. On appeal, Mr. Zadeh argued that his trial should have been severed from that of Ms. Pannell-Brown, since a substantial amount of the evidence against Ms. Pannell-Brown was not admissible against, or even relevant to him, thereby posing a significant risk of prejudice. Mr. Zadeh also contended that the trial court should have suppressed a black T-Mobile cell phone that was seized from his pocket, in violation of the Fourth Amendment of the United States Constitution[1] and Article 26[2] of the Maryland Declaration of Rights.[3]

---

[1] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[2] Article 26 of the Maryland Declaration of Rights provides:

That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

[3] The Court of Special Appeals also considered whether the trial court should have

(continued . . .)

The Court of Special Appeals, in an unreported opinion, reversed Mr. Zadeh's conviction and remanded the case to the Circuit Court for Montgomery County, holding that (1) the trials should have been severed because the joint trial unfairly prejudiced Mr. Zadeh and the resulting prejudice could not be cured; and (2) the cell phone should have been suppressed because the officer conducted a warrantless seizure of the cell phone from his person and none of the recognized warrant exceptions applied. The State appealed the decision of the Court of Special Appeals, and this Court granted *certiorari* to consider the following questions:

1. When a jointly tried defendant claims that there were too many limiting instructions for a jury to effectively follow, should the reviewing court first consider whether the limiting instructions were justified by non-mutually admissible evidence?[4]

---

(…continued)

admitted third-party prior bad acts evidence about the victim's son, Cecil Pannell-Brown, and whether the trial court unfairly limited Mr. Zadeh's attorney's closing argument. This Court denied Mr. Zadeh's conditional cross-petition to review those issues; thus, they are not before us in the present appeal.

[4] The State presented its question in its brief as follows:

Did the trial court properly exercise its discretion in denying motions for severance and a mistrial where [Mr.] Zadeh and his co-defendant participated in the same crime, nearly all of the evidence at the joint trial was mutually admissible, and the court's limiting instructions were more than sufficient to alleviate any potential prejudice?

We answer the question for which we granted *certiorari*.

2

2. When a warrant authorizes the seizure of certain evidence from a car, and an officer, during a lawful frisk of the driver, feels evidence that falls within the warrant, does the plain-feel doctrine permit seizure of that evidence?

For reasons discussed *infra*, we find that non-mutually admissible evidence was introduced and admitted at trial, and the limiting instructions were insufficient to cure the prejudice. Regarding the seizure of the cell phone, we conclude that seizure of the phone from Mr. Zadeh's person exceeded the parameters of the Fourth Amendment and Article 26 of the Maryland Declaration of Rights. In the absence of a valid search and seizure warrant for the search of his person or an applicable exception to the warrant requirement, the seizure of the cell phone was unlawful. Accordingly, we shall affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

On August 4, 2014, at approximately 12:30 p.m., officers from the Takoma Park Police Department responded to a 911 disturbance call at the home of Cecil Brown and Larlane Pannell-Brown at 805 Colby Avenue in Takoma Park, Montgomery County, Maryland. Police were called to the residence after Ms. Pannell-Brown appeared at her neighbor's back door, screaming and yelling. Ms. Pannell-Brown informed the officers that she had found her husband unconscious in their backyard, bleeding from the back of the head. The police entered the backyard, where they discovered seventy-three-year-old Cecil Brown lying face-down on the ground, deceased. The autopsy report from the medical examiner revealed that he died from injuries consistent with blunt force trauma.

3

The lead investigator, Detective Richard Poole, subsequently interviewed Ms. Pannell-Brown regarding the events leading up to her husband's murder. Ms. Pannell-Brown advised Detective Poole that she spoke with Mr. Brown on the phone earlier that morning while he was at work. Ms. Pannell-Brown claimed that she called Mr. Brown on his co-worker's cell phone number to ask if he could inspect her truck because it had been making a strange noise. After the alleged phone call, she left her truck in the driveway for her husband to work on when he came home. When her husband returned after 10 a.m., she left the family home to make a bank deposit. Upon her return, she discovered the victim lying dead in the fenced enclosure behind their house. Detective Poole requested that Ms. Pannell-Brown allow him to examine her cell phone to confirm that she placed the call to her husband. Ms. Pannell-Brown agreed. However, Detective Poole was unable to locate the phone number or contact in her call log. Ms. Pannell-Brown informed Detective Poole that she had recently purchased a new phone and that she may have made the call from the new phone. While looking through her call logs, Detective Poole discovered that one of her cell phones reflected a phone call around 6:41 a.m. to an "Ali." Ms. Pannell-Brown told the detective that "Ali" was a friend that she engaged to detail her truck when needed, and she called him that morning to determine whether he had time to service her vehicle. She also advised the detective that "Ali" had a wife and baby in Jamaica, and she was helping them immigrate to the United States.

4

The same day, one of the victim's sons, Cecil Pannell-Brown ("Beanie"),[5] informed Detective Poole that Ms. Pannell-Brown had been engaged in a year-long affair with a man named "Ali," and advised the officer that "Ali" drove a silver Jaguar station wagon and was employed at a nearby car rental facility. Detective Poole again questioned Ms. Pannell-Brown about her relationship with "Ali" and she maintained that the two were merely friends.

Upon receiving this information, Detective Poole obtained Ms. Pannell-Brown's consent to take both of her cell phones with him and requested that she come to the police station later that day for an interview. She agreed. Thereafter, as part of a "preliminary investigation," Detective Poole and another detective went to the Enterprise Rent-a-Car on New Hampshire Avenue to question "Ali" about the nature of his relationship with Ms. Pannell-Brown. His manager informed the detectives that the "Ali" they were looking for was Hussain Ali Zadeh ("Mr. Zadeh"). Mr. Zadeh asked Detective Poole whether he was there to talk about "the lady's husband that died." Detective Poole confirmed the purpose of his visit and asked Mr. Zadeh how he became acquainted with Ms. Pannell-Brown. Mr. Zadeh revealed that Ms. Pannell-Brown was a mutual friend that he met through a co-worker, and that she was assisting him with immigration issues. During the interview, Detective Poole also inquired whether Mr. Zadeh owned a vehicle, presumably based on information he received from Beanie about the Jaguar station wagon. Mr. Zadeh advised

_____

[5] Cecil Pannell-Brown is referred to in the record below as "Beanie." We refer to him as Beanie throughout this opinion for consistency and clarity.

Detective Poole that he did not. Mr. Zadeh also informed Detective Poole that he had taken the subway to work, arrived at Enterprise between 12 and 12:30 p.m. for his shift, and that he had not spoken to anyone before he left for work that afternoon. Detective Poole observed Mr. Zadeh's hand in his pocket and "assumed that he had a phone in there." Detective Poole subsequently asked Mr. Zadeh for his cell number and for permission to see his cell phone, but Mr. Zadeh repeatedly refused, claiming that the phone in his pocket was not his and his cell phone was at home.

Detective Poole and his team then began investigating Ms. Pannell-Brown and Mr. Zadeh as suspects for the murder of Mr. Brown. On August 5, 2014, the Takoma Park detectives observed a 2007 silver Jaguar station wagon in a parking lot near the Enterprise car rental facility. It was determined that the vehicle was registered to Ms. Pannell-Brown, although it was frequently driven by Mr. Zadeh. Detective Gregory Wolff[6] subsequently applied for and was granted a search warrant for the Jaguar.[7] The search warrant indicated that the officers were permitted to search the vehicle for evidence of the crime of murder, including "any object which may have been used to cause the victim's injuries[,]" and "photos, notes, documents, electronic equipment which stores data[.]" That evening

---

[6] The hearing transcript refers to Detective Wolff as "Glen B. Wolf." The warrant application and oath for the T-Mobile cell phone reflects that his name is Detective Gregory Wolff.

[7] As far as we can ascertain, the search warrant application for the Jaguar was not included in the record. Without the application, we are unable to determine the specific information and facts known to the affiant that provided the basis for the search warrant. Unfortunately, in the absence of the warrant application, we can only rely on the officers' testimony at the suppression hearing.

around 9:00 p.m., Detective Poole and the Special Assignment Team ("SAT")[8] that was surveilling the Jaguar stopped the vehicle, which was operated by Mr. Zadeh, to execute the search and seizure warrant. Detective Poole requested that Mr. Zadeh, the operator of the vehicle, exit the Jaguar and proceeded to pat him down for "officer safety." During the frisk, Detective Poole felt a cell phone in Mr. Zadeh's pants pocket and seized it. A subsequent search of the station wagon the following morning[9] uncovered eleven other pieces of evidence, including a "swab of suspected blood." The search warrant inventory report and return listed a twelfth item—"a T-Mobile cell phone belonging to Hussain Ali Zadeh"—as seized from the "pocket of 'Ali[.]'"

The officers did not secure a separate search and seizure warrant for the cell phone they seized on August 5 until August 7, 2014. In the warrant application for that cell phone—specific to its *contents*—no mention was made of or reference to the frisk of Mr. Zadeh or how the officer came to seize his cell phone.[10] Rather, the application for the

---

[8] The SAT is a team of plain clothes officers that assists the investigative section of the Takoma Police Department. The SAT officers were tasked with surveilling the vehicle and the area surrounding the Enterprise car rental. The SAT observed Mr. Zadeh getting into the Jaguar and followed him to a residence in Silver Spring. They informed Detective Poole that Mr. Zadeh had gotten back into the vehicle and was traveling to another location. At that time, Detective Poole initiated the stop of the vehicle.

[9] Detectives Poole and Holmes did not conduct the search of the Jaguar upon stopping the vehicle. It was transported to the Takoma Park Police Department's property impound, and the following morning, officers executed the warrant and searched the vehicle.

[10] Detective Wolff stated that the cell phone was "recovered" from Mr. Zadeh and he was seeking a warrant to search the contents of the cell phone.

7

search warrant cited the aforementioned facts and "numerous inconsistent statements made by Larlane Brown and Hussain Ali Zadeh" as reasons why there may be evidence of the murder connected to his cell phone. A later search and seizure warrant application for the cell phone *records* associated with the cell phone number corresponding to the seized cell phone was obtained on August 18, 2014.[11] However, the detectives did not obtain a warrant to search Mr. Zadeh—or any cell phones belonging to him—until September 12, 2014.

On August 15, 2014, the police executed a search warrant on the Browns' Takoma Park residence. While searching the premises, police discovered life insurance documents belonging to Ms. Pannell-Brown, that designated Mr. Zadeh as the sole beneficiary of her retirement account and a life insurance policy in her name. Officers also uncovered two pages of undated handwritten-notes referring to homemade poisons, a taser flashlight, and a box for a "tactical stun flashlight." One of the hand-written notes referenced the following poisons: "Carbon Monoxide," "Botulin," "Belladonna," "Hemlock," and "Aconite." The other note included a recipe for the production of cyanide. The police also recovered a computer in Ms. Pannell-Brown's bedroom which revealed internet searches for information, such as "what energy drinks are very harmful" and "how harmful are energy drinks for people over 70 years of age?" An earlier search of her cell phones had also revealed web searches for "what causes sudden cardiac arrest" and "what drink cause[s] heart failure?"

---

[11] There was an issue as to whether the warrant for the records corresponding to the seized phone was executed within 15 days. The warrant and facsimile from T-Mobile were ultimately admitted into evidence after Detective Wolff testified to receiving the records via email.

On September 18, 2014, Detective Poole arrived at the Enterprise Rent-a-Car business with a warrant for DNA evidence and for any cell phones belonging to Mr. Zadeh. In executing the warrant, the officers seized two other cell phones from Mr. Zadeh, separate from the T-Mobile cell phone seized on August 5. Several months later, in May 2015, Detective Poole discovered that Mr. Zadeh and Ms. Pannell-Brown were renting an apartment together in Takoma Park. Detectives Poole subsequently obtained a warrant to search the apartment. During the execution of the search warrant, the detectives found prescription medications prescribed to Ms. Pannell-Brown and Mr. Zadeh, and evidence that the apartment was presently occupied by a man and a woman. On May 28, 2015, Ms. Pannell-Brown and Mr. Zadeh were arrested at the Thurgood Marshall Baltimore Washington International Airport ("BWI") and charged with first-degree murder and conspiracy to commit murder. Additional facts are discussed below as relevant to the issues before this Court.

## B. Procedural Background

At trial, the State proceeded on the theory that Mr. Zadeh and Ms. Pannell-Brown had conspired to kill Mr. Brown to maintain their romantic relationship. Prior to the trial, defense counsel filed a Motion to Sever the joint trial and a Motion to Suppress the T-Mobile cell phone and any information acquired from it.

### 1. *Pre-Trial Motions Hearings*

Mr. Zadeh filed a pretrial Motion to Sever his trial from that of Ms. Pannell-Brown, arguing that the State's evidence against Ms. Pannell-Brown was not admissible against him, and the non-mutually admissible evidence would unfairly prejudice him. During a

hearing on the motion, Mr. Zadeh argued that there were three categories of evidence that were not admissible against him: (1) testimonial hearsay evidence, (2) non-testimonial hearsay evidence; and (3) other material that was irrelevant and highly prejudicial to Mr. Zadeh. In response, the State argued that "the evidence [was] mutually admissible as to both co-defendants," and if the defendants were to be tried separately, "the exact same evidence [was] going to be used twice."

The trial court found the evidence mutually admissible against each defendant, stating that "there[] [is] really no reason to sever the trials because as long as there[] [is] no *Bruton* [*v. United States*][12] problem, then clearly it's in everyone's interest, other than maybe the defendants ... to have one trial." In denying the motion, the court held that joinder was appropriate and presented little risk of prejudice. The court further found that any prejudice that may result from the joinder could be resolved with limiting instructions. Defense counsel filed a motion to reconsider the decision denying the motion to sever, in light of the decision by this Court in *State v. Hines*. 450 Md. 352, 148 A.3d 1247 (2016). The trial judge again denied the motion.

At the suppression hearing in April 2016, the trial court denied the motion to suppress the seizure of Mr. Zadeh's cell phone in light of the search warrant obtained by

---

[12] In *Bruton*, the Supreme Court held that, when the confession of a non-testifying co-defendant is introduced at a joint trial, the introduction of the confession violates the confrontation clause of the Sixth Amendment, even when a limiting instruction is given. "[W]here the powerfully incriminating extrajudicial statements of a co[-]defendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial[,]" the effect of the instructions is limited. 391 U.S. 123, 135–36, 88 S. Ct. 1620, 1628 (1968).

the detectives for the Jaguar that indicated the "search shall be for evidence for the crime of murder, including trace evidence, any torn cloth, any object that may have been used to cause the victim's death[]" and "[a]ny photos, notes, documents, electronic equipment[,] which stores data." According to the trial court, "electronic equipment which stores data[]" encompassed the seizure of the cell phone, regardless of the fact that the cell phone was not found in the vehicle.

> THE COURT: And looking at the search warrant for the Jaguar, it was to search the vehicle, the 2007 Jaguar station wagon bearing so and so tags, VIN [] so and so. The search shall be for evidence for the crime of murder, including trace evidence, any torn cloth, any object that may have been used to cause the victim's death. And then (d) is: And photos, notes, documents, electronic equipment which stores data. All right. Well, that one would certainly include a cell phone.

The trial court denied the motion to suppress, finding that the officer had a valid search warrant and, in the alternative, that the plain-feel doctrine applied to the search of Mr. Zadeh's pocket.

### 2. *The Jury Trial*

At trial, the State introduced a series of text messages and various testimony from individuals connected with Ms. Pannell-Brown to prove that Mr. Zadeh and Ms. Pannell-Brown killed Mr. Brown for financial benefit and the continuance of their affair. While investigating the murder, police obtained piecemeal phone records from a Verizon cell phone. From those records, it was determined that Mr. Zadeh and Ms. Pannell-Brown were texting each other on the morning of the murder. The following exchange from those text messages was introduced at trial:

> [MS. PANNELL-BROWN]: When I text you, come out side

11

[MR. ZADEH]: OK from what door??

[MS. PANNELL-BROWN]: The bed room your friend name is bryan

[MR. ZADEH]: OK got u LOL

[MS. PANNELL-BROWN]: Come now

Over eight days, the State introduced testimony from more than thirty witnesses, including Mr. Brown's adopted son, Bernard Brown ("Bernard"),[13] two of Ms. Pannell-Brown's neighbors, a real estate attorney who entered into a contract with Ms. Pannell-Brown to sell her Takoma Park home, the custodian of records from the Browns' mortgage company, Beanie, and his wife, Tahira Pannell.

On the first day of trial, Bernard Brown testified regarding a conversation he had with Ms. Pannell-Brown when she returned from the police station on August 4. Bernard testified that Ms. Pannell-Brown told him that, when she found Mr. Brown in the backyard, she ran over to him and grabbed him, but he noticed that she did not have any blood on her. Defense counsel objected to the testimony as hearsay and following a bench conference on the issue of the limiting instructions, the trial judge instructed the jury not to consider statements made by Ms. Pannell-Brown against Mr. Zadeh and vice versa.

One of the neighbors, Miranda Morris, testified that Ms. Pannell-Brown "suggested that she was seeing someone, a boyfriend[.]" Ms. Morris also alluded to tension in the Brown household at that time because the couple seemed to be experiencing financial difficulties:

---

[13] We refer to Bernard Brown by his first name to distinguish references to him from those to his father.

12

[THE STATE]: Did there come a time when you noticed any unusual changes in [Ms. Pannell-Brown's] behavior?

[MS. MORRIS]: I would say, I want to say a year, year and half before Cecil was killed.

[THE STATE]: And can you describe those changes? What[,] if any[,] were there?

[MS. MORRIS]: She started kind of confiding in me, I guess, that Cecil was out of work, that they didn't have any money to pay bills. She was really frustrated with him, like kind of implying that he wasn't trying. She asked for some loans, small ones at first, and then larger ones down the line.

[THE STATE]: And when you say complaining he wasn't trying, trying to do what?

[MS. MORRIS]: She described him as sitting around the house all day, as opposed to, you know, going out and seeking employment. He was a contractor, right? So, going out and looking for work on current jobs. She said he just sat all day.

***

[THE STATE]: And you mentioned loans. I want to direct your attention to January of 2014. Do you remember loaning Ms. Pannell-Brown money in that month?

[MS. MORRIS]: Yes.

***

[THE STATE]: What did she say to you?

[MS. MORRIS]: That the, that Cecil's truck would get repossessed if she didn't pay, if she didn't make the payment on it, and that he wouldn't, really wouldn't be able to work.

Defense counsel argued that the hearsay testimony of Ms. Morris was highly prejudicial to Mr. Zadeh, prompting the court to give a limiting instruction that the evidence was only relevant to Ms. Pannell-Brown. On the same day, the State introduced testimony from

Tahira Pannell—Beanie's wife—alluding to the fact that Ms. Pannell-Brown was having an affair and had been hiding money from her husband. Mr. Zadeh challenged the admissibility of the statements Ms. Pannell-Brown allegedly made to her daughter-in-law regarding her finances, as well as statements encouraging her to "get a friend on the side" too.

One of the most controversial pieces of evidence came in the form of testimony from Beanie, which the State introduced along with the aforementioned text messages regarding a "bedroom door." While on the stand, the prosecution asked Beanie about a "bedroom door" at the Colby Avenue address. On direct, Beanie testified that his mother referred to the door leading to the backyard as his "father's bedroom door." Defense counsel argued that the text messages between Mr. Zadeh and Ms. Pannell-Brown concerning an elusive bedroom door in conjunction with hearsay testimony from Beanie as to what his mother called that door was highly prejudicial. The trial court ultimately struck the statements regarding what Ms. Pannell-Brown supposedly called "any particular door."

The custodian of records from the Browns' mortgage company also testified that Ms. Pannell-Brown made statements to his colleague during a phone call, in which she inquired about a potential insurance policy on the house or the mortgage. This testimony was determined by the court to be double-hearsay that could not be used against Mr. Zadeh, and a limiting instruction followed.

The real estate attorney testified that, on September 21, 2014, Ms. Pannell-Brown entered into a contract to sell the home she shared with her husband and was set to receive

$85,000 from the sale. The trial court again provided a limiting instruction regarding the testimony of the real estate attorney because the evidence was "just being offered as evidence against Defendant Pannell-Brown" and "should only be consider[ed] vis-à-vis her." To cure any potential prejudice to Mr. Zadeh, the trial judge gave at least nine different limiting instructions[14] during the course of the trial, before deciding that he would not give an explicit instruction every time the State introduced a statement by Ms. Pannell-Brown that was only admissible against her.[15] Before the close of evidence, defense counsel moved for a mistrial, arguing improper joinder because so much of the evidence presented and the testimony heard from State witnesses was admissible against Ms. Pannell-Brown, but not Mr. Zadeh, and severance was no longer available as a remedy to cure the resulting prejudice. Defense counsel argued, outside the presence of the jury, that the defendants were tried together for "the State's convenience" and there was no other way to fix the resulting prejudice to Mr. Zadeh than to grant a mistrial. The trial court subsequently denied the motion for the mistrial. Defense again moved for a mistrial citing

[14] The trial judge gave a tenth instruction to "disregard" portions of the testimony regarding what Ms. Pannell-Brown called any particular door and that testimony was not supposed to be considered against either defendant.

[15] At a certain point, the trial judge determined that the jury "understood" that statements made by Ms. Pannell-Brown were not admissible against Mr. Zadeh and refused to give the same limiting instruction every time a statement by Ms. Pannell-Brown was introduced. ("All right. Well, okay, but we know this. I'm not going to, I'm not going to give them an instruction every time, you know, there's some piece of evidence. They know that anything that she's saying at this point with regard to him is relevant to her…[a]nd not to Mr. Zadeh.").

the "copious evidence introduced at [the] trial" that would not be admissible in a separate jury trial against Mr. Zadeh alone. The court again denied the motion.

### C. Opinion of the Court of Special Appeals

In noting his appeal before the Court of Special Appeals, Mr. Zadeh asserted that (1) the trial court abused its discretion in denying his motions for severance and a mistrial, (2) the court erred in denying his motion to suppress, (3) the trial court incorrectly excluded third party prior bad acts evidence, and (4) the prosecutor made improper remarks during closing arguments that severely prejudiced him and the trial court abused its discretion in refusing to strike the comments and limiting his counsel's closing argument. The Court of Special Appeals agreed with Mr. Zadeh regarding the issues of severance and the motion to suppress. *Pannell-Brown v. State*, 2019 WL 962812, *1. In reviewing the motion to sever, the Court determined that the joint trial unfairly prejudiced Mr. Zadeh under *Hines*. *Id*. at *15 (citing *Hines*, 450 Md. at 366). According to the Court, the introduction and admission of non-mutually admissible evidence prejudiced Mr. Zadeh because the trial court gave too many limiting instructions and the sheer number of limiting instructions over the course of the trial made the instructions ineffective for the purpose of curing the prejudice. *Id*. at *20–21.

The Court further found that the trial court abused its discretion in denying the motion for a mistrial because no other form of relief would have cured the prejudice to Mr. Zadeh, once the trial court realized how much of the evidence was inadmissible against him. *Id*. Next, the Court of Special Appeals concluded that the cell phone found on Mr. Zadeh should have been suppressed, because the warrant for the search of the Jaguar did

16

not extend to the search of Mr. Zadeh himself, and that the plain-feel doctrine did not provide justification for the warrantless search and seizure of his cell phone. *Id*. at \*22–23. According to the Court, the officers lacked probable cause to believe that the cell phone confiscated from Mr. Zadeh's person, and not from inside the vehicle for which the officers had a warrant, was a weapon or that there was evidence on the cell phone that would link Mr. Zadeh to the crime charged. *Id*. at \*23. "There [was] no indication in the record that Detective Poole knew anything more particularized about the cell phone; the phone itself raised no officer safety concerns, and was obviously a phone, not a weapon." *Id.* at \*23-25. Accordingly, the Court of Special Appeals reversed the conviction and remanded the case to the circuit court with instructions to suppress the seizure of the T-Mobile cell phone.

## STANDARD OF REVIEW

Maryland Rule 4-253(c) grants the trial court discretion in deciding whether to grant or deny a motion to sever. A denial of severance is an abuse of discretion where (1) non-mutually admissible evidence will be introduced; (2) the admission of the evidence causes unfair prejudice; and (3) such prejudice cannot be cured by other relief. *Hines*, 450 Md. at 369–70, 148 A.3d at 1263. Even though "severance determinations are within the sound discretion of the trial court," that discretion is not to be abused, or "exercised arbitrarily[.]" *Id.* at 380, 148 A.3d at 1263; *Day v. State*, 196 Md. 384, 388, 76 A.2d 729, 730 (1950). Instead, discretion regarding whether to grant a motion for severance should be exercised "so as to prevent injustice." *Day*, 196 Md. at 394, 76 A.2d at 733 (internal citations omitted).

17

We also review the denial of a motion for a mistrial under an abuse of discretion standard. Although the trial court determines when to grant a mistrial, it is "an extreme sanction" that should only be granted "when no other remedy will suffice to cure the prejudice." *Burks v. State*, 96 Md. App. 173, 187, 624 A.2d 1257, 1265 (1993); *see Hunt v. State*, 321 Md. 387, 422 (1990), *cert. denied*, 502 U.S. 835 (1991) ("The declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice.").

In reviewing the denial of a motion to suppress evidence, we accord great deference to the factual findings rendered by the trial judge. *Whiting v. State*, 389 Md. 334, 345, 885 A.2d 785, 791 (2005). On the other hand, in deciding whether a police encounter was unlawful, and suppression was warranted, we review legal conclusions *de novo*—without deference to the trial court. *Id.*, 885 A.2d at 791. We engage in "'our own independent constitutional appraisal' of whether the Fourth Amendment has been violated by applying the law to the facts of the matter [before us]." *McCracken v. State*, 429 Md. 507, 515, 56 A.3d 242, 246 (2012) (citations omitted). In our review, we are limited to the record of the suppression hearing, not the trial, in determining whether the seized evidence should have been suppressed. *Grant v. State*, 449 Md. 1, 14, 141 A.3d 138, 145 (2016) (citing *State v. Wallace*, 372 Md. 137, 144, 821 A.2d 291, 295 (2002)).

## DISCUSSION

### A. The trial court abused its discretion in denying the Motion for Severance and the Motion for a Mistrial.

1. *The Standard for a Motion to Sever a Joint Trial*

The State contends that the evidence introduced against Ms. Pannell-Brown at trial was mutually admissible against her co-defendant, Mr. Zadeh, and the Court of Special Appeals did not apply the *Hines* test appropriately because it did not analyze each piece of evidence to determine whether it was non-mutually admissible before making the final determination that Mr. Zadeh would have been prejudiced based on the exhausting number of limiting instructions. The State further argues that the testimony regarding the alleged bedroom door was not actually admitted against either defendant, and the *Hines* analysis concerns non-mutually admissible evidence that *is* admitted. Mr. Zadeh argues that the State's case-in-chief included 31 witnesses and over 300 exhibits, and none of the evidence presented directly implicated him. In particular, Mr. Zadeh took issue with the presentation of notes and internet searches regarding death by cyanide and other poisons, and a series of indiscernible text messages from around the time of the murder, especially the message to Mr. Zadeh referencing a mysterious "bedroom" door. Mr. Zadeh also objected to the introduction of purported hearsay evidence covering seven different State witnesses. Mr. Zadeh argues that the limiting instructions did not insulate Mr. Zadeh from the prejudice that would and did result from the admission of the non-mutually admissible evidence. We agree because (1) non-mutually admissible evidence was introduced; (2) the admission of that evidence prejudiced Mr. Zadeh; and (3) the limiting instructions were insufficient to cure the prejudice.

Maryland Rule 4-253 contemplates the joinder of defendants and offenses. Regarding the joinder of defendants, a trial court may "order a joint trial for two or more defendants charged in separate charging documents[,] if they are alleged to have

19

participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses[,]" and "most of the evidence admissible at trial is mutually admissible[.]" *Hines*, 450 Md. at 355, 148 A.3d at 1248. Subsection (c) of Rule 4-253 provides, in pertinent part: "*[i]f it appears that any party will be prejudiced by the joinder for trial of* counts, charging documents, or *defendants, the court may, on its own initiative or on motion of any party, order separate trials*[.]" (emphasis added). Stated differently, "where joinder will result in prejudice to one or more defendants, a trial judge has discretion under Maryland Rule 4-253 to grant a severance or order other relief as justice requires." *Hines*, 450 Md. at 355, 148 A.3d at 1248. In the context of both co-defendant and offense joinder, the crux of the severance inquiry is whether the joinder is unduly prejudicial. *Hines*, 450 Md. at 378, 148 A.3d at 1262. "What differs between the two situations is the *application* of the test—how a trial court determines the existence of prejudice." *Id*. (emphasis in original). A defendant must demonstrate that "non-mutually admissible evidence will be introduced *and* that the admission of such evidence will result in unfair prejudice." *Id*. at 376, 148 A.3d at 1260 (emphasis in original) (internal citations omitted).

Under *State v. Hines*, the test for determining whether a motion for severance of defendants should be granted is whether (1) non-mutually admissible evidence will be introduced; (2) the admission of that evidence will unfairly prejudice the defendant requesting severance; and (3) any unfair prejudice that results from admitting the non-mutually admissible evidence can be cured either by severance of the defendants or some other relief such as limiting instructions or redactions. *Id*. at 369–70, 148 A.3d at 1257. In

20

such cases, where a limiting instruction or other relief is inadequate to cure the prejudice, the denial of severance is an abuse of discretion. *Id*. at 370, 148 Md. at 1257. In *Hines*, a co-defendant, Tevin Hines, was unfairly prejudiced by the admission of non-mutually admissible evidence. Pre-trial, the attorneys for Mr. Hines argued that the recorded statements of his co-defendant, Dorrien Allen, implicating a man named "Mike," that police officers believed was actually Mr. Hines, were inadmissible against him at trial. *Id*. at 357–58, 148 A.3d at 1250. Included in the recording was commentary by the police about what they purportedly knew to be true and accusing Mr. Allen of lying about the identity of the other person pictured in the surveillance video with him. *Hines*, 450 Md. at 383, 148 A.3d at 1265. At the pre-trial motions hearing, defense counsel argued that "the only inference that [could] be drawn at that point [was] that it[][was] Mr. Hines [in the video] and that Mr. Allen [was] lying about it[.]" *Id*. at 358, 148 A.3d at 1250. This Court determined that the evidence was unfairly prejudicial because the judge could and should have granted relief, namely the motion for severance, or in the alternative, redacted the statement so that it did not lead the jurors to believe that Mr. Allen was lying about "Mike" and that the other suspect in the video had to have been his co-defendant, Mr. Hines. *Id*. at 358, 148 A.3d at 1250. This Court found that "Hines was significantly prejudiced by the actual admission of evidence that, although admissible against Allen, was inadmissible against Hines." *Id*. We held that, "even as redacted to omit any express reference to 'Tevin Hines, Allen's statements implicated Hines in a damaging way, which resulted in prejudice to Hines. *Id*. at 384, 148 A.3d at 1265. In the *Hines* case, this Court was clear that, while the trial judge has discretion in determining whether to order severance, there is a

21

considerable interest in protecting defendants against unfair prejudice and that interest should guide the determination of whether severance is appropriate. *Id*. at 369, 148 A.3d at 1256 (citing *Frazier v. State*, 318 Md. 597, 607, 569 A.2d at 689 (1990)).

Here, the Court of Special Appeals was correct in determining that the evidence implicated the *Hines* test and severance was appropriate because Mr. Zadeh was similarly prejudiced by non-mutually admissible evidence. The heart of the analysis in ascertaining whether severance is warranted is whether undue prejudice will result from the introduction and admission of the non-mutually admissible evidence. Mr. Zadeh was unduly prejudiced by the non-mutually admissible evidence. The limiting instructions could not cure the prejudice, because a reasonable jury could not have sifted through each piece of non-mutually admissible evidence and the subsequent limiting instructions to determine which evidence was admissible against which defendant. The State argues that *Hines* requires the court to review each piece of evidence to determine first whether it is non-mutually admissible, but *Hines* does not set forth any such requirement. The State reads *Hines* too narrowly. The premise of limiting instructions in this context is to prevent unfair prejudice, and when there are too many limiting instructions they simply cannot serve that purpose. *Id*. at 383, 148 A.3d at 1265 (discussing *Erman v. State*, 49 Md. App. 605, 434 A.2d 1030 (1981) ("[P]rejudice occurred when non-mutually admissible evidence was introduced in a degree so great as to render the several limiting instructions repetitive, mundane, and meaningless, so as to fall upon deaf ears.")).

In the case at bar, the State mentioned the "bedroom" door issue during closing argument. Although the jury was advised that the testimony from Beanie regarding the

22

bedroom door was inadmissible, the introduction of his statements in conjunction with the obscure text messages referencing a supposed "bedroom" door and the mention of the door at various points throughout the trial posed a substantial risk of prejudice to Mr. Zadeh because it would be nearly impossible for any reasonable juror to disregard these statements when considering the evidence against Mr. Zadeh. *See Hines,* 450 Md. at 384, 148 A.3d at 1265 ("In the present case, it would have been practically impossible for the jurors to dismiss from their minds the statements of [Mr.] Allen when evaluating the evidence against [Mr.] Hines."). The prejudice resulting from this statement, even though the jury was instructed to strike it entirely, could have been cured with a limiting instruction or a redaction (or in this case being stricken from the record), but throughout the trial, there were several other statements by Ms. Pannell-Brown and evidence admissible against her alone. Taken together, the evidence had the "cumulative effect" of prejudicing Mr. Zadeh. *Erman*, 49 Md. App. at 616, 434 A.2d at 1038.

After all the limiting instructions and categorizing of statements by Ms. Pannell-Brown that the trial judge determined were only admissible against Ms. Pannell-Brown, even the most attentive and intelligent juror would have had a difficult time determining what evidence was admissible against which defendant. So much so that the prosecution acknowledged it would be an "insurmountable task" for the attorneys to classify which evidence was admissible against Mr. Zadeh and which evidence was only admissible against Ms. Pannell-Brown. The prosecutor who tried the case feared she "might miss something" if the attorneys were required to "go back through and [] review the whole trial" to solidify which evidence was admissible against whom. The trial judge remarked

23

that a proposed jury instruction listing what evidence was admissible against which defendant would serve to "create[] confusion if [they] c[ould]n't agree on what it is that [the jury] need[ed] to consider separately." This fact is telling. It would be unreasonable to expect a jury to keep up with all of the limiting instructions, when the attorneys and the court could not do so. As such, the extent of the non-mutually admissible evidence and its impact on Mr. Zadeh could not be cured and the motion for severance should have been granted.

We also note that the trial court erred in denying the motion for a mistrial because, once the trial judge determined that there was significantly more non-mutually admissible evidence than he originally thought, the only available and appropriate remedy was a mistrial. While the discretion to grant a mistrial should be exercised with great care, the situation in this case warranted such a remedy. In analyzing whether severance or, in some cases, a mistrial is appropriate, fairness to the defendant is what guides us. The interest in efficiency and "judicial economy" should not outweigh the interest in ensuring that a defendant is afforded a fair trial. *Erman*, 49 Md. App. at 616, 434 A.2d at 1038. Accordingly, the Court of Special Appeals did not err in holding that the trial judge abused his discretion in denying the motions for severance and a mistrial.

**B. The trial court erred in denying the motion to suppress the cell phone seized from Mr. Zadeh's pants pocket.**

The State contends that the police lawfully seized the cell phone from Mr. Zadeh's pants pocket under the plain-feel doctrine because "[Detective Poole] had probable cause to believe that [Mr.] Zadeh's cell phone contained evidence relevant to the murder

investigation."  Mr. Zadeh argues that the Court of Special Appeals correctly held that the

trial court erred in denying the motion to suppress because (1) the warrant did not extend

to the cell phone, (2) the plain-feel doctrine did not apply to the seized cell phone, and (3)

none of the other delineated warrant exceptions were applicable.[16]

1.  *The Parameters of the Search Warrant*

Although the search warrant for the Jaguar could be properly executed to search and

seize the vehicle and anything *inside of the vehicle*, which fit the warrant description, the

cell phone on Mr. Zadeh's person was not implicated in the warrant.   It is a fundamental

tenet of criminal procedure that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and *particularly describing the place to be searched,*

*and the persons or things to be seized*." U.S. Const. amend. IV; *see also* Md. Const.,

Declaration of Rights, Art. 26 ("[A]ll *general warrants to search suspected places, or to*

*apprehend suspected persons, without naming or describing the place, or the person in*

*special, are illegal*, and ought not to be granted.") (emphasis added).  The purpose of the

requirement that a valid search warrant describe the place, people, or things to be searched

and seized with sufficient particularity is to protect citizens from constitutionally prohibited

general warrants, which effectively permit unlimited searches of private residences and

---

[16] The facts do not implicate any of the following warrant exceptions: (1) search incident to a lawful arrest (*Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009)); (2) hot pursuit (*Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642 (1967)); (3) the plain view doctrine (*Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301 (1990)); (4) the automobile exception (*Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280 (1925)); (5) stop and frisk (*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)); (6) consent (*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973)); and (7) exigency (*Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849 (2011)). *See Grant v. State*, 449 Md. 1, 16, 141 A.3d 138 n.3 (2016).

25

places of business. "The particularity requirement 'ensures that the search will be carefully tailored to its justifications and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" *Peters v. State*, 224 Md. App. 306, 342–43, 120 A.3d 839, 861 (2015) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013 (1987)). "A particular warrant also 'assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and *the limits of his power to search*.'" *Groh v. Ramirez*, 540 U.S. 551, 561, 124 S. Ct. 1284, 1292 (2004) (emphasis added) (citing *United States v. Chadwick*, 433 U.S. 1, 9, 97 S. Ct. 2476 (1977)).

In the case at bar, the search warrant specified a particular "conveyance" to be searched: a 2007 Jaguar station wagon, that was silver in color. The warrant also included the vehicle identification number ("VIN") and the corresponding license plate number. The subject of the warrant was clear—the search could not exceed the parameters of the specifically outlined "places to be searched." The vehicle search warrant allowed for the search of "evidence of the crime of [m]urder" including but not limited to:

A: Trace evidence to include but not limited to blood, hairs, and fibers on clothing, shoes, or items/material located therein.

B: Any torn cloth dark in color

C: Any object which may have been used to cause the victim's injuries/death . . . the cause of death was determined to be blunt force trauma.

D: Any photos, notes, documents, or electronic equipment which stores data

F: Anything that is illegal to possess.

26

Probable cause to search and seize electronic equipment in one location cannot be transferred to a person. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 342 (1979) (explaining that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). Holding that the warrant could extend beyond the search of the vehicle contravenes the purpose and premise behind the particularity requirement. "We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled." *United States v. Di Re*, 332 U.S. 581, 586–87, 68 S. Ct. 222, 225 (1948). The law recognizes "the unique, significantly heightened protection afforded against searches of one's person." *Wyoming v. Houghton*, 526 U.S. 295, 303, 119 S. Ct. 1297, 1302 (1999). Therefore, the facts and circumstances that justified probable cause to grant a warrant for the conveyance could not be transferred to a person simply due to his or her presence in the conveyance at the time that the warrant was executed. Mr. Zadeh was not a person to be searched under the warrant for the vehicle, and the cell phone in his pocket was not an item that could be searched or seized. If the officers had probable cause to believe that Mr. Zadeh had committed a crime or that his cell phone was evidence of crime, the correct avenue would be to obtain a search or arrest warrant for Mr. Zadeh. *See Kentucky v. King*, 563 U.S. 452, 459, 131 S. Ct. 1849, 1856 (2011) ("Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, this Court has inferred that a warrant must generally be secured."); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868 (1968) ([T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure[.]"). Given that the

27

warrant obtained was limited to the Jaguar, the Court will not contradict the law through speculation and transfers of probable cause. Although the warrant incorporates the application by reference, the application was not included in the record and the Court's analysis is limited to the warrant itself. The dissent attempts to piecemeal support for the search of Mr. Zadeh's person by using the vehicle search warrant language, when it is clear that the warrant and the probable cause sufficient to obtain that warrant does not apply to Mr. Zadeh. As such, the officers were not entitled to conduct a warrantless seizure of Mr. Zadeh's cell phone.

### 2. *The Officer's Conduct Amounted to Warrantless Search and Seizure*

At the suppression hearing, Detective Poole indicated that he asked Mr. Zadeh to exit the vehicle because the officers were "seizing the vehicle and the contents." He further stated that he "patted [Mr. Zadeh] down for officer safety and removed a cell phone from his pocket." Detective Poole later testified that he initiated the pat-down because Mr. Zadeh "was [] being investigated for murder" and that he "wanted to [e]nsure the safety of the officers and [himself]." Therefore, we begin our analysis from the point of view that the pat-down was conducted for officer safety.[17]

The State contends that the officer was permitted to seize the cell phone during the protective frisk under the plain-feel doctrine. The State plainly argues that the search warrant for the silver Jaguar "supplied the probable cause to believe that the cell phone

---

[17] We begin our analysis here because the supposed basis for the frisk that led to the seizure of the cell phone was a pat-down for officer safety. The discussion that follows is relevant to whether the officer could lawfully seize the cell phone.

28

contained evidence of a crime," and therefore, the officer could seize anything falling into that category of evidence that he felt in conducting the protective frisk.[18] We disagree.

In *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330 (1977) the Supreme Court recognized that an officer may order persons out of an automobile and frisk those persons for weapons. Protective pat-down frisks are proper when the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Longshore v. State*, 399 Md. 486, 508–09, 924 A.2d 1129, 1141 (2007) (quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883). However, the scope of the pat-down is limited by the Fourth Amendment's prohibition on unreasonable searches and seizures.[19] It is well-established that warrantless searches and seizures are "presumptively unreasonable" as violative of the Fourth Amendment, absent an applicable warrant exception. *Grant*, 449 Md. at 16–17, 141 A.3d at 146–47 (citing *Katz v. United States*, 389 U.S. 347, 356–57, 88 S. Ct. at 514–16 (1967)).[20] The plain-feel doctrine allows an officer, during the course of a lawful frisk, to

---

[18] The dissent disagrees with our characterization of the State's position. However, the quoted language was taken directly from the State's briefs.

[19] This Court has held that, "[t]he officer may not exceed the limited scope of a pat-down for weapons to search for contraband. 'General exploratory searches are not permitted [pursuant to *Terry*], and police officers must distinguish between the need to protect themselves and the desire to uncover incriminating evidence.'" *Bailey v. State*, 412 Md. 349, 369, 987 A.2d 72, 84 (2010) (internal citations omitted).

[20] In addition to a protective frisk for officer safety, another exception to the Fourth Amendment's per se unreasonable search and seizure is the *Terry* stop. In *Terry v. Ohio*, the Supreme Court held that "a police officer with reasonable suspicion, supported by articulable facts, that criminal activity 'may be afoot,'" may briefly stop and detain a person

(continued . . .)

seize weapons and nonthreatening contraband, if the incriminating character is "immediately apparent." *See Minnesota v. Dickerson*, 508 U.S. 366, 374, 113 S. Ct. 2130, 2136–37 (1993). The seizure is only justified when, through a lawful pat-down of outer clothing, the "contour or mass make[] [the object's] identity immediately apparent" so there is no invasion of the person's privacy. *Id*. at 375–76. Further patting of an object that is obviously not a weapon is impermissible. *See In re David S.*, 367 Md. 523, 544, 789 A.2d 607, 619 (2002) (stating that "[i]f during a lawful pat-down an officer feels an object which obviously is not a weapon, further patting of it is not permissible[]"); *see also*, *Dickerson*, 508 U.S. at 373, 113 S. Ct. at 2136 (noting that an officer's continued exploration of a suspect's pocket after having determined that it did not contain a weapon was not permissible in the context of a pat-down). The incriminating nature of the item is immediately discernable or apparent when the officer, upon feeling or seeing it, has probable cause to believe that the item in question is evidence of a crime or contraband.

_____

(. . . continued)

for investigative purposes. *Longshore*, 399 Md. at 506, 924 A.2d at 1129 (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884). "'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others', the officer may conduct a pat-down [frisk] to determine whether the person is in fact carrying a weapon." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1881) (internal quotations omitted). However, the scope of the frisk is limited. The purpose of a Terry frisk "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence[.]" *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923 (1972). Although Detective Poole did not conduct a *Terry* stop and frisk, *Terry* and its progeny provide guidance as to the limits of a protective pat-down that results from either reasonable suspicion that criminal activity is afoot or for officer safety during a traffic stop. Therefore, the Court looks to *Terry* for guidance as to the limits of the officer's conduct.

30

*See Arizona v. Hicks,* 480 U.S. 321, 326, 107 S. Ct. 1149, 1153 (1987) (holding that probable cause is required to invoke the "plain view" doctrine, from which the "plain feel" doctrine is derived). Therefore, officers are permitted to conduct a protective frisk and seize weapons and items that, upon feeling the outer limits of the clothing, reveal contraband or other incriminating evidence without the need for further investigation or manipulation to "discern its identity." *McCracken v. State*, 429 Md. 507, 513, 56 A.3d 242, 245 (2012).

To determine whether the incriminating nature of the cell phone was immediately apparent to the officer at the time of the frisk, we turn to the testimony of Detective Poole. At the suppression hearing, Detective Poole testified that the SAT had been surveilling the vehicle and notified him when Mr. Zadeh entered the vehicle and began driving. The SAT stopped Mr. Zadeh, and shortly thereafter, Detective Poole "approproached the vehicle and asked [Mr. Zadeh] to step out of the vehicle." The following colloquoy occurred:

[THE STATE]: And then what did you do?

[DETECTIVE POOLE]: I patted him down for officer safety and removed a cell phone from his pocket.

[THE STATE]: Now why did you pat him down?

[DETECTIVE POOLE]: He was, is being investigated for a murder and I wanted to [e]nsure the safety of the officers and myself.

[THE STATE]: And when you patted him down, what did you feel?

[DETECTIVE POOLE]: A cell phone in his pocket.

[THE STATE]: What did you do then?

[DETECTIVE POOLE]: I took the phone out of his pocket.

31

Moreover, at the time the SAT executed the search warrant on the Jaguar and Detective

Poole frisked Mr. Zadeh, he knew:

> [Ms.] Pannell-Brown and [Mr.] Zadeh were having an affair about which
> they had both lied; that they spoke on the phone regularly, including at 6:41
> a.m. on the morning of the murder; that they had given contradictory
> accounts about what was discussed in the conversation; and that
> [Mr.] Zadeh had repeatedly refused to show the detective his cell phone to
> confirm his account of what he had done on the morning of the murder.

*Pannell-Brown*, 2019 WL 962812, at \*23 (footnote omitted).  Based on the information

known to the officers at the time the search warrant for the vehicle was executed, the search

of Mr. Zadeh and subsequent seizure of the cell phone in this case amounted to a

warrantless search and seizure because (1) the search exceeded the limits of a protective

frisk and (2) under the plain-feel doctrine, it was not immediately apparent that the cell

phone was incriminating or evidence of crime.

In *McCracken v. State*, this Court found that an officer who was able to determine

the nature of incriminating evidence during a pat-down or frisk could seize the evidence

from the individual's person under the plain-feel doctrine.  *McCracken*, 429 Md. at 510,

56 A.3d at 243.  A cursory search of the outer limits of clothing that reveals incriminating

evidence, weapons, or other contraband without a warrant is not a Fourth Amendment

violation.  *Id.* at 510–11, 56 A.3d at 244.  ("[I]f the officer, while conducting a proper *Terry*

frisk, comes upon an item that by mere touch is immediately apparent to the officer to be

contraband or of 'incriminating character,' then the officer is authorized to seize the item

immediately.").  In *McCracken*, Reginald McCracken was convicted of transporting a

handgun in a motor vehicle.  *Id.* at 511, 56 A.3d at 244.  Officers were dispatched in

32

response to a report of an armed individual in the area. *Id*. Upon arrival, an officer observed a woman and a man in an apparent argument. *Id*. at 511–12, 56 A.3d at 244. The woman told the officers that she had caught a hack[21] driven by Mr. McCracken, and while she was traveling in his vehicle, Mr. McCracken threatened to shoot her. *Id*. at 512, 56 A.3d at 244. Upon learning this information, the officer approached Mr. McCracken, who asserted that he and the woman were arguing about a cell phone. *Id*. at 512, 56 A.3d at 245. He denied the allegation that he had been hacking, or illegally operating a taxicab. Instead, Mr. McCracken told two conflicting stories: (1) that he arrived on foot and (2) that his wife had dropped him off at his present location. *Id*. The officer conducted a subsequent warrantless frisk of his person. *Id*. In frisking Mr. McCracken, the officer felt an electronic car remote hooked to a set of keys in his pants pocket. *Id*. Believing that the remote would lead them to the vehicle Mr. McCracken had been using to hack, the officer removed the remote and keys from Mr. McCracken's pocket. *Id*. at 512–13, 56 A.3d at 245. The officer pressed the alarm button, which led him to a nearby car. *Id*. The officer peered through the car window with his flashlight, saw a handgun in the open glove compartment, and seized it as evidence. *Id*. This Court held that the seizure was authorized under the plain-feel doctrine because the officer "had amassed sufficient evidence that those items, although in and of themselves innocuous, were immediately apparent to be

---

[21] "'Hacking' is a colloquial term used to describe the provision of taxi services without a license." *McCracken*, 429 Md. at 511, 56 A.3d at 244 n. 1.

evidence of [Mr. McCracken]'s involvement in hacking a short time earlier." *Id.* at 519,

56 A.3d at 249.[22]

This case is distinguishable from *McCracken* because there was nothing

incriminating about the cell phone that the officer would have been able to discern from

merely patting down Mr. Zadeh's outer clothing. There, the officer had sufficient evidence

that the keys and remote in the suspect's pants pocket were relevant to an earlier committed

crime—hacking. In this case, there was insufficient evidence against Mr. Zadeh to form

such a basis. At the time that he frisked Mr. Zadeh, Detective Poole believed that Mr.

Zadeh and Ms. Pannell-Brown were having an affair, they lied about the nature of their

relationship, they both appeared nervous when asked about the other, and they spoke on

the phone on the morning of murder. Despite the dissent's characterization of the facts

known to the officer at the time of the search, there is nothing inherently or even remotely

criminal about a cell phone, based on the very limited information known to the officer at

---

[22] This Court's decision in *Bailey v. State* is consistent with this Court's holding in *McCracken*. In *Bailey*, an officer felt a glass vial while patting down the defendant. 412 Md. at 369-70, 987 A.2d at 84. In his experience, the officer knew that PCP is generally contained in a glass vial. However, "the incriminating nature of the object in the defendant's pocket was not immediately apparent upon his initial touch of the object in the pat-down. Rather, [the officer] testified that he field-tested the liquid contained in the vial after removing it from the [defendant's] pocket[.]" *Id.* at 370, 987 A.2d at 84. After this testing, the officer determined that the liquid was PCP. *Id.* In other words, the officer needed information beyond that which was found in the protective frisk to determine the criminality of the object in the defendant's pocket. We held that "[t]he removal of the vial from the [defendant's] pocket and [subsequent] field test of the liquid contained in the vial constituted a general exploratory search" that exceeded the permissible scope of the officer's protective frisk. *Id.* Our holdings in *Bailey* and *McCracken* reinforce the premise that an officer must know of the criminality of an object *before* the officer may go beyond the limits of a protective frisk.

the time of the frisk. *McCracken* makes clear that seemingly innocuous items may be incriminating, *if* the officer has "amassed sufficient evidence" such that it is immediately apparent to the officer that the item is evidence of involvement in a crime. *McCracken*, 429 Md. at 519, 56 A.3d at 249.

In addition, the dissent categorizes traffic stops as "especially fraught with danger to police officers." However, it should be noted that the predicate for the stop was the execution of the search warrant for the vehicle. The officers did not observe a traffic violation or have any basis to believe criminal activity was afoot. *See Terry*, 392 U.S. at 31, 88 S. Ct. at 1885 (stating that an officer may conduct a limited cursory search "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot…"). Assuming the officer conducted a valid frisk because he reasonably believed Mr. Zadeh was armed and dangerous, he exceeded the parameters of that authority by removing and seizing what was clearly a cell phone, not a weapon, from his person. The officer did not testify that he believed the cell phone concealed anything that could have posed a physical threat to officer safety.[23] In addition, all of the evidence cited in the search warrant was for a vehicle Ms. Pannell-Brown purchased and owned and its contents—not Mr. Zadeh. Because there was nothing implicating Mr. Zadeh and the officers did not have sufficient information linking him or

---

[23] "Digital data stored on a cell phone cannot itself be used as a weapon to harm an . . . officer[.]" *Riley v. California*, 573 U.S. 373, 387, 134 S. Ct. 2473, 2485 (2014).

35

his cell phone to Mr. Brown's murder (or any other crime for that matter), there was no probable cause to search Mr. Zadeh beyond a protective frisk.[24]

Furthermore, Detective Poole testified that he immediately knew the object was a cell phone. He was not able to discern any incriminating nature of the cell phone just by feeling for the phone. Detective Poole's search and the seizure went beyond what was necessary to neutralize any threat to officer safety and the basis for the seizure was the so-called incriminating nature of the phone itself. When Detective Poole frisked Mr. Zadeh, he knew that Mr. Zadeh had spoken to Ms. Pannell-Brown by phone the morning of the murder. A phone call four hours before a murder between two people who are known to speak on the phone regularly does not rise to the level of a particular fact linking the phone to the murder. It was obvious by feeling on the outside of his pants that it was a cell phone in his pocket, and the cell phone alone was not incriminating absent more information known to the officer about Mr. Zadeh's involvement in a crime. At the point Detective Poole determined that the item was a cell phone and not a weapon, the search should have

---

[24] The dissent represents that the warrant somehow provides support for the seizure of the cell phone, without linking the probable cause sufficient for the search of the vehicle and items found inside the vehicle, to the search of Mr. Zadeh's person. The dissent also argues that *Moats v. State,* 455 Md. 682, 168 A.3d 952 (2017), establishes that an officer may seize a cell phone of an individual whom the officer believes to have committed a crime. In *Moats*, "the cell phone was seized pursuant to the search incident to arrest doctrine refined in *Riley* permitting the police to seize a cell phone pursuant to an arrest that is based on probable cause that the arrestee has committed a crime." *Id.* at 697, 168 A.3d at 960–61. The issue in *Moats* was whether the police could retain the arrestee's cell phone until a search warrant was obtained; not the initial seizure of the phone. *Id.* In this case, Detective Poole did not arrest Mr. Zadeh during the encounter; and thus, the conduct was not a search incident to an arrest. Therefore, we find *Moats* inapposite.

ended.  Instead, Detective Poole removed the phone and seized it.  Accordingly, we find

that Detective Poole was not permitted to seize the phone.[25]

The dissent assumes that the cell phone Detective Poole seized was "of

incriminating character."  There are no facts that indicate the incriminating nature of the

cell phone, and reaching such a conclusion, merely by *feel*, lacks support in logic as well

as fact.  The State and the dissent take the position that "the police could not have obtained

authorization to seize [electronic equipment which stores data] without a showing of

probable cause," but the probable cause sufficient for the warrant to search that vehicle and

its contents, is separate and distinct from that which would support the search of Mr.

Zadeh's person.

The State relies on the application supporting the search warrant for the cell phone

contents to argue that the officers had probable cause to search Mr. Zadeh and seize his

---

[25] In *Dashiell v. State*, 374 Md. 85, 821 A.2d 372 (2003), this Court addressed the "narrow issue" of "whether the Fourth Amendment prohibits an officer from conducting a limited protective frisk for weapons on persons, located within a residence being searched pursuant to a valid search warrant[.]"  *Id*. at 95, 821 A.2d at 377 (footnote omitted).  There, the officers had reliable information that weapons were likely to be in the house.  *Id.* However, the facts of *Dashiell* are not analogous to the facts in this case.  In *Dashiell*, the officer conducted a protective frisk within the bounds of *Terry* by checking for weapons without conducting a search.  *Id.* at 95, 821 A.3d at 377–78 n. 3.  The officer conducting the frisk testified that "he had 'located a plastic bag of suspected crack cocaine in [petitioner's] front pants pocket' and that '[t]hey didn't remove it [from petitioner's pocket].'"  *Id.*  Only after the petitioner admitted that she had drugs on her person and the officer had grounds to arrest the petitioner was she searched.  *Id.*  In the case at bar, the question before the Court recognizes that the seizure occurred "during a lawful frisk of the driver[.]"  The issue for determination is whether the seizure was unlawful.  Given that the petitioner in *Dashiell* did not object to the seizure and the Court did not analyze this issue, *Dashiell* is not instructive here.

cell phone. However, the subsequent pursuit of this search warrant did not cure the previous Fourth Amendment violation. In its reply brief, the State argues that the issue in this case is the seizure of the phone from Mr. Zadeh's person and not the search of the phone's contents because "it is undisputed that the police obtained a warrant before performing further analysis" of the contents of the phone. Although that may be true, when and how the cell phone was seized matters for the purposes of the Fourth Amendment. If the seizure of the cell phone was unlawful, information revealed through subsequent searches of the phone, which the police had no right to possess, must be suppressed. A post hoc search warrant for the contents of the cell phone does not remedy a previous unlawful seizure of the same phone. Not only was the warrant obtained after the Fourth Amendment violation had occurred, part of the basis for the warrant specific to the cell phone's contents, giving the officers probable cause to seize and search the cell phone, was information that the officers obtained *after* the cell phone had already been seized.[26]

We decline to conclude that Detective Poole had the requisite authority to seize the cell phone. In failing to obtain a warrant *before* the search of and seizure from Mr. Zadeh, and in the absence of an applicable warrant exception, Detective Poole violated the Fourth Amendment. If the officers had probable cause to believe Mr. Zadeh committed a crime or that his cell phone was evidence of the crime of murder, they would have obtained an

---

[26] Detective Wolff included information that was obtained in attempting to execute the warrant for the Jaguar station wagon on August 5, including a conversation with Mr. Zadeh's ex-wife, and evidence that was discovered in searching the vehicle on August 6.

appropriate search warrant for Mr. Zadeh and any cell phones belonging to him at the time they obtained the warrant for the vehicle.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Court of Special Appeals and hold that (1) severance was appropriate given the extent of the unfair prejudice to Mr. Zadeh; (2) a mistrial should have been declared once the degree of non-mutually admissible evidence was revealed and the limiting instructions were ineffective; and (3) the cell phone seized from Mr. Zadeh's person should have been suppressed because it was the fruit of an unlawful search and seizure in violation of the Fourth Amendment and Article 26 of the Maryland Declaration of Rights.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Judge Watts joins in judgment only.

Circuit Court for Montgomery County
Case No. 127706C
Argued: November 5, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2019

_____

STATE OF MARYLAND

v.

HUSSAIN ALI ZADEH

_____

McDonald,
Watts,
Hotten,
Getty,
Booth,
Battaglia, Lynne A. (Senior
Judge, Specially Assigned),
Greene, Clayton, Jr. (Senior
Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J., dissenting in part,
which McDonald, J. joins.

_____

Filed: April 3, 2020

As the saying goes, "facts are stubborn things."[1]  This aphorism rings particularly true when we must evaluate the reasonableness of a law enforcement officer's actions.  Our determination can *only* be made based on the totality of the facts known to the investigating officer.  Viewing the totality of the circumstances, I would reach two different conclusions than the Majority.  First, during the course of a murder investigation in which Mr. Zadeh was a prime suspect, Detective Poole lawfully frisked Mr. Zadeh.  Second, Detective Poole possessed the requisite probable cause belief about the incriminating character of Mr. Zadeh's cell phone under the plain feel doctrine.  Therefore, while I agree with the Majority that the circuit court abused its discretion in denying the Motion for Severance and Motion for Mistrial, I respectfully dissent from the Majority's conclusion that the circuit court should have suppressed Mr. Zadeh's cell phone and thus I would reverse the judgment of the Court of Special Appeals on that issue.

I would first note that Mr. Zadeh never contested the validity of Detective Poole's frisk.  This issue is neither preserved for appellate review nor was it briefed by the parties. *See* Maryland Rule 8-131(a); *Abeokuto v. State*, 391 Md. 289, 327 (2006) (explaining that appellate review of an unpreserved claim is only appropriate when the issue can be described as "compelling, extraordinary, exceptional, or fundamental").  The Majority

---

[1] Founding Father and Second President of the United States, John Adams, recited these words during his successful defense of William Wemms, a British soldier charged in the Boston Massacre (also referred to in historical literature as Cpl. Weems) John Adams, *Argument for the Defense: 3–4 December 1770*, Founders Online, National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016, archived at https://perma.cc/FDM2-SPL9.

raises this issue *sua sponte*, even though the question posed to and granted by this Court in the State's petition for writ of certiorari contemplates whether the plain feel doctrine permits the seizure of evidence encompassed in a duly authorized search warrant but found "*during a lawful frisk*."[2] *See* Majority Slip Op. at 2. I begin by explaining why the frisk is, indeed, lawful.

This Court's standard of review of a circuit court's decision on a motion to suppress evidence bears repeating. Our analysis is "confined to the record developed at the suppression hearing." *McCracken v. State*, 429 Md. 507, 515 (2012) (quoting *Longshore v. State*, 399 Md. 486, 498 (2007)). We view the evidence developed at the suppression hearing, and reasonable inferences drawn therefrom, in the light most favorable to the prevailing party, which in this case benefits the State. *Crosby v. State*, 408 Md. 490, 504 (2009) (citing *State v. Williams*, 401 Md. 676, 678 (2007)). This review accords great deference to the circuit court's findings of fact, which we accept unless clearly erroneous. *Id.* at 504–05 (quoting *Nathan v. State*, 370 Md. 648, 659 (2002)). Nevertheless, we conduct an "'independent constitutional appraisal' of whether the Fourth Amendment has been violated by applying the law to the facts of the matter" before us. *McCracken*, 429 Md. at 515 (quoting *Bailey v. State*, 412 Md. 349, 362 (2010)).

---

[2] The Court of Special Appeals' opinion below declined to address the validity of the frisk because it concluded the resulting seizure was unlawful. *Pannell-Brown v. State*, Nos. 1065 & 1329, Sept. Term, 2017, 2019 WL 962812, at \*22 (Md. Ct. Spec. App. Feb. 26, 2019). Instead, the court "[a]ssum[ed], without deciding, that the frisk was reasonable." *Id.* at \*23.

*A.    Information known to law enforcement before the frisk.*

The Majority recognizes, and we agree, that the validity of an officer's frisk rises and falls on the level of knowledge known to the officer when the frisk occurred. However, the Majority's analysis misses the mark—it fixates on the warrant issued to search a silver Jaguar (registered to Ms. Pannell-Brown, yet known to law enforcement as primarily driven by Mr. Zadeh) and ignores the abundance of information collected by law enforcement during the murder investigation.[3]   Remaining faithful to the appropriate standard of review, we examine the information known to law enforcement when Detective Poole conducted the frisk, as established at the suppression hearing.

Detective Poole interviewed Ms. Pannell-Brown on August 4—the day of the murder. Ms. Pannell-Brown acknowledged the fact that she called the cell phone of Mr. Zadeh and spoke with him at 6:41 a.m. that same morning, after Mr. Brown had left for work. At first, Ms. Pannell-Brown described Mr. Zadeh as "a guy that works at Enterprise [Rent-A-Car] that details her truck," and explained that she spoke to him that morning "to ask him to detail her car." As the interview progressed, Ms. Pannell-Brown revealed that the relationship between her and Mr. Zadeh was more involved than she had previously disclosed. In fact, she "had been talking to [Mr. Zadeh] a lot" because she was attempting to help with the immigration of other Zadeh family members to the United States.

---

[3] The Majority goes so far as to declare that "the facts and circumstances that justified probable cause to grant a warrant for [the silver Jaguar] could not be transferred to a person simply due to his or her presence in the conveyance at the time the warrant was executed." Majority Slip Op. at 27. This is not my contention, nor, from what I can tell, is it the State's argument.

At the crime scene, Detective Poole also spoke to Cecil Pannell-Brown.[4]  Cecil informed Detective Poole that Ms. Pannell-Brown and Mr. Zadeh were engaged in a year-long affair, which, contrary to Ms. Pannell-Brown's story, was sexual in nature.  Cecil told Detective Poole that he had confronted Ms. Pannell-Brown and Mr. Zadeh about the affair.  Cecil further explained that he disrupted a meeting in the Enterprise parking lot between Mr. Zadeh and Ms. Pannell-Brown on July 31, 2014.  Upon Cecil's arrival on that day, Mr. Zadeh got into a silver Jaguar station wagon and left.

Detective Poole also interviewed Mr. Zadeh on the day of the murder.  Tellingly, when Detective Poole first introduced himself, Mr. Zadeh immediately responded, "this is about the lady's husband that died."  Mr. Zadeh conceded that he arrived at Enterprise, his place of employment, "around 12:00 [p.m.], 12:30 [p.m.], noon."  This Enterprise facility is located at 6875 New Hampshire Avenue and is less than one mile from the scene of the murder, 805 Colby Avenue.  It is unknown for how long Mr. Brown was lying in his back yard before first responders arrived and pronounced him dead at the scene at 12:36 p.m.

When asked if he had spoken to Ms. Pannell-Brown on August 4, Mr. Zadeh became nervous.  Mr. Zadeh initially said that he had not spoken to anyone by phone that morning.  Mr. Zadeh later corrected himself, and "remembered that [Ms. Pannell-Brown] had called him that morning, or that day."  According to Mr. Zadeh, Ms. Pannell-Brown told him on the phone, "Ali, my husband is dead."  In contrast to Mr. Zadeh's timeline, the only call from Ms. Pannell-Brown to Mr. Zadeh's phone occurred at 6:41 a.m.—hours before the

---

[4] Cecil Pannell-Brown is the son of Ms. Pannell-Brown and the deceased Mr. Brown.  For clarity, I shall refer to Mr. Pannell-Brown by his first name.

4

midday murder. Detective Poole requested to see Mr. Zadeh's phone to confirm his story. Mr. Zadeh stated that he did not have his phone with him; yet, based on his hand placement in his pocket, Detective Poole believed Mr. Zadeh's phone was in his pocket.

The inconsistencies in Mr. Zadeh's story did not end there. At first, Mr. Zadeh told Detective Poole that he rode the subway and took a bus on the morning of August 4 to get to work at Enterprise. Later, when Mr. Zadeh backtracked and recalled the 6:41 a.m. phone call, he indicated to Detective Poole that he told Ms. Pannell-Brown, "I can't talk. I'm driving." Additionally, Mr. Zadeh denied that Ms. Pannell-Brown "ever mentioned anything to him that morning about detailing her car." Like Ms. Pannell-Brown, Mr. Zadeh's account of the relationship also changed throughout the course of the interview, from "only know[ing Ms. Pannell-Brown] from the parking lot of the Enterprise" to her "helping him with his family."

Through the course of their respective interviews, Mr. Zadeh and Ms. Pannell-Brown presented Detective Poole with conflicting and changing stories. Viewed in the light most favorable to the State, these facts fairly establish, at least, that (1) Ms. Pannell-Brown and Mr. Zadeh were having an affair about which they both had lied; (2) both spoke on the phone regularly, including at 6:41 a.m. on the morning of the murder; (3) both gave conflicting accounts about what was discussed in the early morning conversation; (4) both became nervous when questioned about the other; and (5) Mr. Zadeh repeatedly refused to show law enforcement his cell phone to confirm his account of what he had done on the morning of the murder. Mindful of all this information known to Detective Poole *before* he frisked Mr. Zadeh, I would reach a different result from the Majority.

5

**B.** *Detective Poole lawfully frisked Mr. Zadeh.*

The Majority concludes that Detective Poole's "conduct amounted to [a] warrantless search and seizure." *See* Majority Slip Op. at 28. However, Detective Poole conducted a Terry frisk upon removing Mr. Zadeh from the vehicle. Precision of language is crucial in Fourth Amendment analysis. As we have said before, "[a] frisk is different from a search of the person." *Norman v. State*, 452 Md. 373, 388 (2017). In the Fourth Amendment context, the Majority's holding would forbid a police officer in the future from frisking an individual suspected of committing a murder when he exits a vehicle subject to a search and seizure warrant, even if the suspect potentially concealed the very object used in a blunt force trauma murder. As a threshold matter, I disagree, and conclude that Detective Poole acted reasonably in frisking Mr. Zadeh.

In *Terry v. Ohio*, the Supreme Court of the United States determined that a police officer's investigatory stop (temporary detention) and subsequent frisk (pat-down) did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. 392 U.S. 1 (1968). Reasonableness is the touchstone of the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996). *Terry* reasoned that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." 392 U.S. at 23. These risks to officer safety exist regardless of whether a stop occurs on the street, in a public gathering space, or, like in this case, after exiting a vehicle. In order to satisfy the strictures of *Terry*, the initial stop must be lawful—i.e., supported by the officer's reasonable suspicion that criminal activity is afoot—and, to frisk, the officer must reasonably suspect that the detained individual is armed and dangerous. *Arizona v.*

6

*Johnson*, 555 U.S. 323, 326–27 (2009). When these elements are satisfied, an officer is permitted to conduct "a carefully limited search of the outer clothing of [the detained individual] in an attempt to discover weapons." *Terry*, 392 U.S. at 30.

The Supreme Court has long recognized that the roadside detention of vehicles and their occupants are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *see also Maryland v. Wilson*, 519 U.S. 408, 414 (1997) ("Regrettably, traffic stops may be dangerous encounters."). Once an officer lawfully detains a vehicle, the officer "may order the driver to get out of the vehicle without violating the Fourth Amendment." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Even though "the predicate for the stop was the execution of the search warrant," the danger to officer safety persists. Majority Slip Op. at 35. Indeed, stopping the vehicle to execute the search warrant may well have heightened the risk because search warrants are intended to uncover evidence of more serious crime. *See Wilson*, 519 U.S. at 414 (extending *Mimms* to permit the roadside removal of a passenger because "the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that *evidence of a more serious crime might be uncovered during the stop*." (emphasis added)). After removing occupants from the vehicle, an officer may then frisk those individuals if there is reasonable suspicion to believe they may be armed and dangerous. *Johnson*, 555 U.S. at 331.

When reviewing the reasonable suspicion determinations of a police officer, an appellate court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal

7

wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 499 U.S. 411, 417–18 (1981)); *Bost v. State*, 406 Md. 341, 356 (2008) ("The test is 'the totality of the circumstances,' viewed through the eyes of a reasonable, prudent, police officer."). This enables officers in the field "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (citing *Cortez*, 499 U.S. at 418). It follows, then, that an officer's "subjective or articulated reasons" do not validate or invalidate a stop or frisk because "[t]he test is objective." *Sellman v. State*, 449 Md. 526, 542 (2016).

"[R]easonable suspicion is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Id.* at 543 (quoting *Crosby*, 408 Md. at 507). The concept is "somewhat abstract," *Arvizu*, 534 U.S. at 274, because it "does not deal with hard certainties, but with probabilities." *Holt v. State*, 435 Md. 443, 467 (2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). While reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch," *Sellman*, 449 Md. at 543 (quoting *Crosby*, 408 Md. at 507), "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citing *Sokolow*, 490 U.S. at 7).

Detective Wolff authored a search and seizure warrant application on the evening of August 8, 2014. The Circuit Court for Montgomery County authorized the warrant, finding "there exists probable cause" to seize and search "a 2007 Jaguar station wagon[,

8

VIN] bearing Maryland registration [License Plate], the vehicle is silver in color." Further, the warrant provided that police "may serve this warrant at any time of the day or night." There is no dispute that the Takoma Park Police Department Special Assignment Team ("SAT") lawfully stopped Mr. Zadeh to seize the vehicle he was driving—the same 2007 silver Jaguar indicated in the duly authorized search and seizure warrant. Therefore, the initial stop was lawful.

Shortly thereafter, Detective Poole arrived on scene and removed Mr. Zadeh from the vehicle. Turning to the reasonableness inquiry, I would conclude that Detective Poole conducted a lawful frisk because: (1) he possessed the requisite reasonable suspicion that Mr. Zadeh may be armed and dangerous; and (2) Mr. Zadeh was located in a vehicle that law enforcement had sufficient evidence to believe contained weapons involved in a murder.

As discussed above, *supra* 3–6, Detective Poole had particularized information about Mr. Zadeh that made him a prime suspect in the murder of Mr. Brown. Notwithstanding that information, the mere fact that law enforcement suspected Mr. Zadeh committed a *murder* gave Detective Poole reason to believe that Mr. Zadeh might be armed and dangerous. While the mere "odor of marijuana emanating from a vehicle, without more" does not provide officers with a reasonable belief that its occupants are armed and dangerous, *Norman*, 452 Md. at 379, "some crimes [e.g., murder] by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have a reasonable suspicion that an individual might be involved in such a crime." *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007); 4 Wayne R. LaFave, Search &

9

Seizure § 9.6(a) 853–54 (5th ed. 2019) (noting that "[l]ower courts have been inclined to view the right to frisk as being 'automatic' whenever the suspect has been stopped upon the suspicion that he has committed" a dangerous crime, including homicide); Wayne R. LaFave, '*Street Encounters' and the Constitution:* Terry*,* Sibron*,* Peters*, and Beyond*, 67 Mich. L. Rev. 39, 88 (1968) ("[A] protective search may always be made when the stopping is to investigate what appears to be a crime of violence.  For other crimes . . . it would apparently take noticeable bulges in the suspect's clothing, movements by the suspect towards his pockets, or similar observations to give rise to a substantial possibility that the suspect was armed.") (internal quotation marks and footnote omitted).  Illustrative of this point, in *Adkins v. Commonwealth*, the Kentucky Supreme Court held in the *Terry* context that "[w]hen an officer believes that he is confronting a murder suspect, he has presumptive reason to believe that he is dealing with an armed and dangerous person."  96 S.W.3d 779, 787–88 (Ky. 2003).  *See also United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007) (citing additional examples).  In my view, the fact that Detective Poole suspected Mr. Zadeh's involvement in Mr. Brown's murder, supported by the specific facts known to him on August 8, made the frisk objectively reasonable.

Next, even assuming Detective Poole did not possess specific information about Mr. Zadeh himself, or discounting the fact that Mr. Zadeh was a murder suspect, Mr. Zadeh was situated in a vehicle subject to a search warrant "for evidence of the crime of Murder." The warrant specifically permitted officers to seize "any object which may have been used to cause the victim's injuries/death"—i.e., weapons—"the cause of death [being] blunt

force trauma."[5]  Objects that cause death by blunt force trauma necessarily pose a threat to police officers executing a search and seizure warrant on an automobile.

On this point, I find *Dashiell v. State* instructive.  374 Md. 85 (2003).  In *Dashiell*, this Court held that a police officer has reasonable suspicion to frisk an individual, although not named in the warrant, who was "located within a premises subject to a search warrant when reliable articulable facts indicating that weapons might be located therein . . . are specifically enumerated by the affiant in the search warrant application, and that warrant is issued without the imposition of any limitations as to the officers' authority to frisk for weapons."  *Id.* at 94.  This case falls squarely within the requirements of *Dashiell*: (1) Detective Poole possessed a search and seizure warrant for the Jaguar that anticipated the existence of weapons used in Mr. Brown's murder; (2) Mr. Zadeh was located within the premises to be searched; and (3) the authorized warrant imposed no limitations to the officers' ability to frisk for weapons.[6]  Indeed, Detective Poole testified during the suppression hearing, that he "patted [Mr. Zadeh] down for officer safety," and that because Mr. Zadeh was "being investigated for a murder[, Detective Poole] wanted to [e]nsure the

---

[5] The Majority asserts that reference to the language of the warrant here is an "attempt[] to piecemeal support for the search of Mr. Zadeh's person."  Majority Slip Op. at 28.  To the contrary, the individual and particularized facts vis-à-vis Mr. Zadeh, *supra* 3–6, provided Detective Poole with the requisite probable cause.

[6] We note, as did the Majority, that Detective Wolff's application for the search and seizure warrant of the vehicle is not in the record.  Nonetheless, we still find *Dashiell* instructive because of the plain language in the duly authorized vehicle warrant and a second warrant application (to search Mr. Zadeh's cell phone).  The second warrant application is included in the record and details information known to law enforcement before the frisk.

11

safety" of the other officers and himself.[7]  Accordingly, based on the totality of the circumstances, Detective Poole possessed sufficient information about Mr. Zadeh personally and about the possibility of weapons in the vehicle to fear for his and the other officers' safety.  Therefore, Detective Poole's frisk was lawful.

I would additionally note, to prime the discussion of the plain feel doctrine that follows, that Detective Poole did not "exceed the parameters" of a *Terry* frisk.  Majority Slip Op. at 26.  The Majority contends that "by removing and seizing what was clearly a cell phone, not a weapon," from Mr. Zadeh, Detective Poole exceeded the scope of a lawful *Terry* frisk.  Majority Slip Op. at 35.  However, the notion that an officer's frisk may be valid or invalid depending on whether an officer removes a weapon or "non-weapon" from the individual's person is not borne out in *Terry* or its progeny.  Instead, the validity of a *Terry* frisk turns on whether an officer "goes beyond what is necessary to determine if the suspect is armed" by "squeezing, sliding, and otherwise manipulating the contents" of the suspect's clothing.  *Minnesota v. Dickerson*, 508 U.S. 366, 373, 378 (1993).  The Majority cannot, and does not, assert that Detective Poole's frisk went beyond what was necessary to determine if Mr. Zadeh was armed.  The record is devoid of any facts necessary to support an argument that Detective Poole exceeded the scope of a *Terry* frisk.  Put another

---

[7] Although the Court of Special Appeals appeared to imply that the validity of the *Terry* frisk was undermined by the fact that "Detective [Poole] also testified that he patted people down as a matter of course when he ordered them out of the car," *Pannell-Brown*, 2019 WL 962812, at *46 n.9, the Supreme Court has made clear that the reasonableness inquiry does not depend on the subjective motivations or actions of a particular officer but rather that "the circumstances, *viewed objectively*, justify that action."  *Whren v. United States*, 517 U.S. 806, 813 (1996) (emphasis added); *supra* at 3.

12

way, Detective Poole did not perceive the item in Mr. Zadeh's pocket to be innocuous and continue to manipulate it or pat it down before realizing it was a cell phone. Because no facts indicate that Detective Poole's frisk went "beyond what is necessary," the frisk was still within the bounds of *Terry* and the plain feel doctrine is applicable.

**C.      *The plain feel doctrine permitted the seizure of Mr. Zadeh's cell phone.***

Under the plain feel doctrine, if an officer, "while conducting a proper *Terry* frisk, comes upon an item that by mere touch is immediately apparent to the officer to be contraband or of 'incriminating character,' then the officer is authorized to seize that item immediately." *McCracken*, 429 Md. at 510–11 (quoting *Dickerson*, 508 U.S. at 375). The theoretical underpinning to the plain feel doctrine—a corollary of the plain view doctrine— is that "there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Dickerson*, 508 U.S. at 375. The Supreme Court has made clear that the character of an item is "immediately apparent" if the officer, "upon seeing or feeling the item, [has] probable cause to believe that the item is contraband or evidence of a crime." *McCracken*, 429 Md. at 513–14 (citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987)).

Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Moreover, probable cause is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371

13

(2003). "In short, probable cause 'is not a high bar.'" *State v. Johnson*, 458 Md. 519, 535 (2018) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

The facts recounted above, *supra* 3–6, that were known to law enforcement and sworn out to acquire the search warrant for the Jaguar sufficed to convince a neutral magistrate that probable cause existed to seize electronic equipment which stores data as specified in the warrant. The Majority summarizes the State's position as follows: "the search warrant for the silver Jaguar 'supplied the probable cause to believe that the cell phone contained evidence of a crime,' and therefore, the officer could seize anything falling into that category of evidence that he felt in conducting the protective frisk." Majority Slip Op. at 28–29. However, the State's argument is clearer and more straightforward than the Majority concedes.[8] The State contends that Detective Poole had probable cause to seize Mr. Zadeh's phone based on the facts of the ongoing murder investigation. The existence of the search warrant—encompassing cell phones found in a car driven by Mr. Zadeh— simply *confirmed* that Detective Poole's had probable cause to seize the phone; otherwise,

---

[8] The Majority's quoted language is excerpted from the State's reply brief. Placed back in context, the State argued as follows:

> [Mr.] Zadeh reads the State's opening brief as arguing that the search warrant for the car authorized the seizure of the phone from [Mr.] Zadeh's person. This is not the State's argument. Rather, the significance of the search warrant was that it *supplied the probable cause to believe that the cell phone was evidence of a crime*. Thus, when Detective Poole felt the cell phone in [Mr.] Zadeh's pocket during a lawful frisk, its incriminating character was immediately apparent, and he was authorized to seize it under the plain-feel doctrine.

(Citation and footnote omitted, emphasis added).

14

the warrant would not enable an officer to do so. *See United States v. Aguirre*, 839 F.2d 854, 859 (1st Cir. 1988) (upholding a plain view warrantless seizure of the defendant's car keys because "the material contained in the original warrant went a long way toward furnishing the necessary factual predicate"). When Detective Poole realized that he was touching a cell phone, the incriminating character (for which law enforcement had already demonstrated probable cause to seize) became immediately apparent. Therefore, he properly seized it.

The Majority cursorily determines that "because there was nothing [in the search warrant] implicating Mr. Zadeh [in the murder] and [law enforcement] did not have sufficient evidence linking him or his cell phone to Mr. Brown's murder (or any other crime for that matter), there was no probable cause to search Mr. Zadeh beyond a protective frisk." Majority Slip Op. at 35–36. This rationale is fundamentally identical to a position rejected by this Court in *Moats v. State*, 455 Md. 682 (2017). There, Moats argued that "the warrant affidavit was devoid of specific facts linking the crimes and the cell phone," yet we indicated that "such direct evidence has never been required by the Fourth Amendment." *Id.* at 700. Moreover, the Majority ignores the information known to Detective Poole at the time of the search and seizure which, in my view, provides the fundamental basis for probable cause.

In *Moats*, a police officer seized a cell phone from an individual believed to have participated in a sexual assault that occurred several weeks earlier. *Id.* at 686–87. This Court considered whether "an individual's suspected involvement in a crime and a police officer's belief that a cell phone could be used in that crime, without more, constitute[d]

15

probable cause to seize and search that individual's cell phone." *Id.* at 693. We answered in the affirmative, concluding that probable cause existed based on the on-going investigation and the presumption that it is "not unusual that persons committing a [crime], document the crime on their cell phone" and that the cell phone "contained evidence of some or all of [the] suspected criminal behavior." *Id.* at 704. Nowhere in *Moats* did this Court consider that the cell phone found on the suspect's person a number of weeks after the alleged crime was not the same cell phone that the suspect possessed on the day the crime was committed.

Applying *Moats* to this case, Detective Poole suspected that Mr. Zadeh was involved in the murder of Mr. Brown. To be sure, at the suppression hearing, when asked why he patted Mr. Zadeh down, Detective Poole replied that Mr. Zadeh was "being investigated for a murder." Detective Poole also believed that Mr. Zadeh used his cell phone to speak to a murder victim's wife, leading up to the murder. This is borne out by: (1) the 6:41 a.m. phone call; (2) the conflicting accounts given by Ms. Pannell-Brown and Mr. Zadeh; and (3) the suspects' nervousness and agitation when being questioned. Later, when Detective Poole frisked Mr. Zadeh, he immediately recognized a cell phone, which he reasonably believed was the same phone used by Mr. Zadeh on the day of the murder. Therefore, Detective Poole had probable cause to seize the phone in the traditional sense (supported by the individual facts known to him) and bolstered by *Moats*.

In sum, all of the elements required for a plain feel seizure were present when Detective Poole seized Mr. Zadeh's cell phone: Detective Poole articulated facts establishing probable cause to seize cell phones linked to Mr. Zadeh; Detective Poole

16

conducted a lawful *Terry* frisk of Mr. Zadeh; in the course of that frisk, it became immediately apparent to Detective Poole that he touched a cell phone likely bearing evidence of a crime.

Finally, the Majority's conclusion that officers "would have obtained an appropriate search warrant for Mr. Zadeh and any cell phones belonging to him" defeats the entire premise behind the plain feel doctrine, that "[r]equiring the officer to obtain a warrant . . . 'would often be impracticable and would do little to promote the objectives of the Fourth Amendment'" when the prerequisites for a plain feel seizure are present. Majority Slip Op. at 38–39; *McCracken*, 429 Md. at 516.

Based on the facts and information known to Detective Poole at the time of the frisk, as established at the suppression hearing, this case fits squarely into this Court's recent Fourth Amendment jurisprudence in *McCracken*, *Norman* and *Moats*. However, the Majority departs from the rationale in those cases. For these reasons, I respectfully dissent and would reverse the judgment of the Court of Special Appeals relating to the cell phone evidence and hold that the circuit court properly denied the motion to suppress.

Judge McDonald has authorized me to state that he joins in this opinion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/25a19cn.pdf